## W. M. REA v. THE STATE.

### No. 3665.   Decided October 20, 1915.

**1.—Murder—Evidence—Conclusion of Witness.**

Where, upon trial of murder, the questions propounded to the witnesses, called for the conclusion of the witnesses, and not for the facts within their knowledge, and the bill of exceptions showed no error, there was no reversible error.

**2.—Same—Evidence—Conduct of Defendant.**

Where defendant was charged with the murder of his wife, there was no error in rejecting testimony, that he was kind, affectionate and loving in his conduct toward his children; the conduct toward his wife was the issue.

**3.—Same—Declarations by Defendant—Arrest.**

Upon trial of murder, there was no error in admitting in evidence the declarations of the defendant with reference to the death of his wife before he was under arrest. Following Martin v. State, 57 Texas Crim. Rep., 264, and other cases.

**4.—Same—Bill of Exceptions.**

Where the record showed that the court overruled the State's objections to the testimony complained of, the bill of exceptions thereto showed no error.

**5.—Same—Charge of Court—Defensive Theory.**

Where defendant was charged with the murder of his wife by poisoning, and the court submitted defendant's requested instructions that unless the jury believed from the evidence beyond a reasonable doubt that the deceased came to her death from arsenical poisoning, and from no other cause, to acquit the defendant, a complaint to the charge that the court had not so instructed the jury, was untenable.

**6.—Same—Suicide—Charge of Court—Accident.**

Where, upon trial of murder, wherein defendant was charged with administering arsenic to his wife which caused her death, and the court submitted

the question of accidental, poisoning, and the evidence did not raise the question of suicide by arsenic, there was no reversible error.

### 7.—Same—Circumstantial Evidence—Charge of Court.

Where the court's charge on circumstantial evidence was in accord with approved precedent, there was no reversible error.

### 8.—Same—Sufficiency of the Evidence—Circumstantial Evidence.

Where, upon trial of murder, which largely depended upon circumstantial evidence the same was sufficient to sustain the conviction under a proper charge of the court, there was no reversible error.

### 9.—Same—Motive—Murder—Degrees.

It is not essential to sustain a conviction for murder that motive be shown. When murder was divided into two degrees, it was held to sustain murder of the first degree, express malice must be shown, but an unexplained killing was always held to be murder in the second degree; and now this rule applies to all murder cases; besides, motive was shown in the instant case.

### 10.—Same—Supplemental Transcript—Affidavits—Practice on Appeal—Misconduct of Jury.

Where appellant brought up to this court what he termed a supplemental transcript, showing the affidavits made, after adjournment of the court, setting up misconduct of one of the jurors, in that he had formed and expressed an opinion prior to being empaneled on the jury, the same could not be considered on appeal, as this court can not consider matters not made part of the record in the trial court.

### 11.—Same—Suggestion to the Legislature.

The attention of the Legislature is called to the fact that under the law as it now exists, this court is not authorized to take into consideration ex parte affidavits, and that it may be advisable for the Legislature to legislate thereon.

Appeal from the District Court of Van Zandt. Tried below before the Hon. W. R. Heath.

Appeal from a conviction of murder; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*Wynne, Wynne & Gilmore,* for appellant.—On question of the insufficiency of the evidence: Brown v. State, 68 Texas Crim. Rep., 269, 150 S. W. Rep., 436; Yarbrough v. State, 151 S. W. Rep., 545; Rios v. State, 69 Texas Crim. Rep., 263, 153 S. W. Rep., 308; Williams v. State, 156 S. W. Rep., 938.

On question of admitting declarations of defendant: Qualls v. State, 158 S. W. Rep., 539; Maclin v. State, 144 S. W. Rep., 951; Lewallen v. State, 33 Texas Crim. Rep., 412; Arnold v. State, 9 Texas Crim. App., 435; Branch's Crim. Law, sec. 218.

On question of the court's charge: Orner v. State, 65 Texas Crim. Rep., 137, 143 S. W. Rep., 935; Sanders v. State, 112 S. W. Rep., 618.

On question of misconduct of jury: Art. 1, sec. 10, Constitution.

*C. C. McDonald,* Assistant Attorney General, for the State.

HARPER, JUDGE.—Appellant was convicted of the offense of mur-

dering his wife by administering to her poison, and his punishment assessed at life imprisonment in the penitentiary.

This was a case of circumstantial evidence, and the State adduced as circumstances tending to show his guilt, that appellant's wife died at night, and he urged the ladies present to at once prepare clothing in which to bury her; that he requested a neighbor to go to town that night to secure a coffin, etc.; that when the neighbor objected to going because it was raining, and his team had been turned out, appellant told the neighbor that he neglected to turn his team out that night and he would find it in the lot, and insisted on him going, and other circumstances tending to show hurried preparation for the burial of his wife. After this testimony was adduced, appellant placed some witnesses on the stand whom he says would have testified that such preparations as he sought to have made that night "were those that ordinarily occur under circumstances of this kind, and were not unusual." The court ruled that such questions as were propounded to the witnesses called for the conclusions of the witnesses and not facts known by them. The bill does not allege that appellant expected to or could have proven by the witnesses that in this neighborhood the coffins were sent for at night immediately after death, and the neighboring ladies urged to begin sewing on the burial shroud the very night of the death and within a short time thereafter. Doubtless it was usual and customary to send for a coffin, and have burial clothes prepared, but the bill ought to have gone further and stated that in that neighborhood those who had those near and dear to them to die, sent for the coffin the very night that the death occurred, and if burial clothes had to be prepared, that immediately upon the death of the wife the husband would ask the ladies to immediately proceed with the preparation, if such was a fact. The court says the questions propounded called for the conclusion of the witnesses and not for the facts within their knowledge. The questions propounded are not included in the bill, and we must accept the bill as approved, and as qualified the bill presents no error.

In the next bill it is shown that the appellant desired to prove by some witnesses that he was kind, affectionate and loving in his conduct towards his children, and often had them in his lap. His conduct towards his children was not an issue in this case, but his conduct towards his wife, and the bill shows that the court permitted each of the witnesses to testify to everything they knew about defendant's conduct towards his deceased wife.

The next bill contends that the court permitted J. R. Kellis, sheriff of the county, to testify to a conversation had with appellant while under arrest. The court, in approving the bill, thus qualifies it: "The witness J. R. Kellis testified as follows: 'I told the defendant that we come to investigate the death of his wife; he told me that he had bought some arsenic from John Pratt with which to kill rats, and that his wife made the arsenic up in a cup and set the cup containing the remainder of it upon the gallery plate. He told me that he put the

rats that he killed with the arsenic over in a patch of woods in a pasture west of his house, and we went over there to see them, and when we got to the place I only found the carcass of one rat. It was dry skin and bones. He further stated that there was some arsenic left and he put it and the paper both in the stove and burned it.' This witness further testified that previous to this conversation he had not arrested the defendant, nor said anything to him about arresting him or about any case about him or any suspicion against him; that he had not in any way restrained him of his liberty, that he was permitted to go at his will and that at one time after said statements were made, the defendant went out of his sight, going into his house and remained there some minutes while this witness was talking to Henry Rusk, and that it was only after his return from the house that he arrested him, which was some time after the foregoing statements had been made. At this time there was no facts nor circumstances proven in the trial of this case that the defendant was under arrest, or that he was even suspicioned as having committed the crime, or that there were any charges of any kind against him." As thus qualified the bill presents no error. Martin v. State, 57 Texas Crim. Rep., 264; Grant v. State, 56 Texas Crim. Rep., 411; Cordes v. State, 54 Texas Crim. Rep., 204; Williams v. State, 53 Texas Crim. Rep., 2; Hart v. State, 15 Texas Crim. App., 202.

Bill of exceptions No. 4 was not approved by the court, but instead of doing so the court states: "The court overruled State's objection to the testimony complained of above and permitted the defendant's attorneys to bring their books in court and to read out of them in framing their questions to the witnesses." This bill, under such circumstances, of course, presents no error.

While there are other complaints in the motion for new trial in regard to the introduction of and rejection of other testimony, the above four bills are all that appear in the record, and the other complaints not being verified in any way, we can not consider them.

The first exception to the charge of the court is that it does not present all the issues in the case, in that it failed to instruct the jury that it devolved upon the State to prove beyond a reasonable doubt that the particular poison from which deceased came to her death was arsenic. The court, in deference to this complaint, gave appellant's special charge in which the jury was told: "Unless you find and believe from the evidence, beyond a reasonable doubt, that the deceased, Nona Rea, came to her death from arsenical poisoning and from no other cause, you will acquit the defendant."

The next exception is that the court erred in not submitting the issue of whether or not deceased committed suicide. The evidence, if any, which tended to raise this issue, is the testimony of appellant and his mother, Mrs. Lizzie Edgerton. Appellant testified that his wife had been in bad health for three years; that she suffered from goitre of the neck and had a womb trouble. He said on Friday, before his wife's death on Tuesday, Dr. Echols had given him a prescription for

his wife; that he had the prescription filled on Sunday, and at the same time purchased a nickel's worth of arsenic to kill rats. A remarkable coincidence in this connection is that he had the prescription charged, but paid cash for the arsenic, thus avoiding a book entry of the purchase of arsenic. On the day of his wife's death appellant approached the doctor and asked him if it would not strengthen his wife to give her some quinine, he replying it could do no harm. Appellant did not purchase any quinine, but did purchase some empty capsules, saying that he got them to give her quinine in. He said just before going to bed on Tuesday night his wife complained of being worse, and asked him to give her a dose of quinine; that he gave her a capsule of quinine, claiming his wife had filled it and had it ready. Soon after this his wife began to have convulsions and froth at the mouth, and complained of it lightning and thundering, when there was no lightning nor thunder. In a short time his wife died. He earnestly insisted that if the capsule contained arsenic he did not know it. The court instructed the jury: "If you shall believe, beyond a reasonable doubt, that the defendant gave to Nona Rea a capsule containing arsenic in quantity sufficient to cause her death, and which did cause her death, but you further believe, or have a reasonable doubt thereof, that at the time defendant so gave said capsule to deceased (if he did) he believed the same to contain quinine; or he did not know that same contained arsenic in quantity sufficient to cause her death, then you will acquit the defendant." Defendant and his mother both testified to her taking patent medicines of various kinds for her ailments, but did not testify as to the contents, or that either of the medicines so taken contained arsenic or any other poisonous substance, but they did testify that she was low-spirited, depressed, and often expressed a wish that she was dead, etc. This testimony did not call for a charge other than those above given by the court—that if deceased died from any cause other than arsenical poison, and that even though she died from arsenical poison, yet if it was given to her by appellant through a mistake, he should be acquitted. The charges as given fully covered the defensive issues as made by the testimony.

The charge on circumstantial evidence is in language frequently approved by this court, and the charge, as a whole, is not upon the weight to be given the testimony. This disposes of all the exceptions to the charge, and the special charges requested and refused were fully covered by the court's main charge in so far as applicable to the issues presented by the testimony.

In the brief filed, and in an able oral argument before this court, appellant's counsel earnestly insists that, this being a case of circumstantial evidence, the evidence is not of that cogency and force to authorize a conviction—that it does not exclude every other reasonable hypothesis other than that of appellant's guilt.

Admit that Mrs. Rea was in bad health, does the evidence raise the issue that she may have died from any other cause than arsenic poison, or does it raise the issue that the poison may have been self-admin-

istered, if she died from such poison, or does it raise the issue that appellant may have given her the poison by mistake? We do not think the issue that it may have been self-administered, if she died from arsenic poison is raised by the testimony. There is no evidence that she took any medicine on the day of her death other than that given her by her husband, appellant, and no evidence from which such inference could be deduced. The only medicine she took on that day was administered by appellant, and shortly thereafter she began to have convulsions. The other two issues were clearly and succinctly submitted by the court, and the jury finds against appellant on such issues. Will the testimony support such finding? Two days before Mrs. Rea's death appellant purchases arsenic, and while he has his other purchases charged, the purchase of this arsenic is kept off the books,—he paying cash for it, and it alone. The day of Mrs. Rea's death he asks the attending physician if quinine would not benefit her. He purchases no quinine, but does purchase empty capsules; that night he administers to his wife a capsule, which he contends contained quinine, but which the evidence would authorize the jury to find contained arsenic, for the witness from whom appellant says he borrowed quinine on that day testifies appellant borrowed no quinine from him. So the record would authorize the jury to find there was no quinine at appellant's house, and that he had knowledge of that fact. Shortly after administering the capsule by appellant Mrs. Rea began to have convulsions, and exhibited other symptoms which the doctors say accompany a death occasioned by administering arsenic. He takes the rings from his wife's fingers before her death, saying it was her desire that they be removed before death, and makes other remarks which indicate that appellant was aware death would ensue, after his wife began to have convulsions. Expressions which would indicate a desire for a hurried burial, and the further fact that when the body was exhumed a portion of the stomach was found to contain arsenic. Dr. Louis Rosenberg testified: "I made the examination and made several different tests and found traces of arsenic in the stomach. I did not make a quantitative test for the reason that I only had a portion of the stomach to work with. In order to have made a quantitative test it would have been necessary to have had the entire stomach and the intestines and the liver and kidneys. There is no such thing as normal arsenic in the stomach. The presence of arsenic in the stomach indicates that the patient has recently taken arsenic." The evidence does not suggest that the arsenic was taken in any other way except that it was administered to Mrs. Rea by appellant in the capsule given her shortly before she began to have convulsions.

It is true appellant, by the testimony offered in his behalf, seeks to explain many of these circumstances, but the jury was not bound to accept the explanations, and when the record is read as a whole one is not surprised that the jury did not do so. Appellant contends no motive was shown why appellant should desire the death of his wife. It is not essential to sustain a conviction for murder, that motive be

shown. It is true that when murder was divided into two degrees in this State—one upon express and one upon implied malice—it was held to sustain murder of the first degree, express malice must be shown, but an unexplained killing was always held to be murder in the second degree. And now this rule applies to all murder cases. So it was not essential that a motive be shown, but we think a motive was shown. Appellant had an invalid wife; the record would suggest that he had become enamored of an excellent young lady in the community—though it might be proper here to state that no improper relations of any character existed, and it is not shown that prior to the death of the wife that the young lady knew of the infatuation of appellant. She, however, was made aware of it in a very few days after the death of Mrs. Rea. Appellant delivered her the rings taken from the fingers of his wife as she was dying, and claimed to have discovered a letter written by his wife. This letter, the evidence demonstrates, was not written by Mrs. Rea, but was written by appellant, and by him shown to the young lady in less than a week after the death of his wife. The letter is as follows:

"Letter of Request to my man and babys

Wills Point Tex 5/10/1914 ·

Dear husband and babys Miron I want you at my death to Keep my to Little girls to geater and be good to thim as you have in the Past You have Been a true husband to me  I never called on you to do eny thing But What you done it god en heaven only Knows how good you are to me sweet  I am not going to Live Long But When I die Put me away nice Burie me en my brow skirt and that silk waist that is to Bee maid and dont Put no Jewelry on me take my Rings of and Let Etter Wallace have to of thim and You Keep Your own and as you all ways thought so much of etter I want you to go to see her for I had Rather she would Come Over My to Little girls than eny one that I know of she is a good girl and a Pure hearted Miron this girl Likes you and I no you do her for you all ways talked so much and I Told you that she was one of the Nacest girls en this country  you write to Etter she cant do nothing but Refuse you are Let you come to see her  Miron Please dont Part my to Little girls for this is my Prair sweet god have mersy on my family and give thim Pure helth and when I am dead and gon take care of thim god bless my husband for he has Been Like a father to me O god he has stayed with me through thick and thin when there was no one else to stay with me god may this couple reign to geather if it is you Powe Precious god if this so does hapen Let thim get along Like we did
god bless my family is my Prair   Amen               Nona Rea."

Appellant also brings up what he terms a supplemental transcript, in which is shown the affidavits of Mr. Petit and wife, made September 23, 1915. The term of court at which appellant was tried adjourned April 9, 1915. So it is evident that the affidavit was some five months

after court had adjourned for the term. We are not authorized to consider this ex parte affidavit, but if we were, as it would show that one of the jurors had formed and expressed an opinion prior to being empaneled on the jury, it would be necessary for us to hear evidence and determine the question whether or not the juror had expressed an opinion, for on the trial the juror must have sworn that he had no opinion that would influence him in rendering a verdict. On appeal we are not authorized by law to hear evidence on such an issue, nor consider matters not made a part of the record in the trial court. It is true, appellant says he was not made aware of this matter until long after court had adjourned for the term, but we are bound by the law which, on appeal, only authorizes us to review the record as made in the trial. It may be that such matters as this may suggest to the Legislature the advisability of authorizing an independent suit to be brought in the trial court to set aside the judgment when grounds are discovered after adjournment of court, as has been provided in civil cases. But under the law as it now exists we are not authorized to take into consideration the affidavit, but must pass alone on the record as certified to us by the clerk of the court, and finding no error therein the judgment is affirmed.

*Affirmed.*