WALTER E. WHITAKER, JR. V. STATE

No. 26,863. March 17, 1954
Rehearing Denied May 12, 1954
Appellant's Second Motion for Rehearing Denied
(Without Written Opinion) June 9, 1954

272

*Burks and McNeil* and *Clifford W. Brown,* Lubbock, for appellant.

*Travis D. Shelton,* District Attorney, *Forrest Bowers,* Assistant District Attorney, Lubbock and *Wesley Dice, State's* Attorney, Austin, for the state.

GRAVES, Presiding Judge.

The conviction is for murder with malice; the punishment assessed is death.

Much of the statement of the case is taken from the appellant's own testimony herein. He was 20 years old at the time the offense was committed, and was 21 years of age at the time of the trial. He was a member of the Air Force, and on January 8, 1953, was stationed at the Reese Air Force Base near Lubbock, Texas. He was reared in Wethersfield, Connecticut. Upon entering the Army he was first assigned to the Sampson Air Force Base in Geneva, New York, and then transferred to the air base near Lubbock, Texas, where he became acquainted with Joyce Fern White. He met her at Lawson's Roller Skating Rink

in Lubbock at different times, and finally attended her at her home. He assisted her many times in her school studies and especially with her algebra. He became well acquainted with the members of her family. Her mother, Mrs. Lena B. White, a widow, was engaged at the time in supervising a nursery where small children would be left by their parents for short periods of time. She had previously operated a boarding and rooming house at such place. Mrs. White was the mother of eight children, and Joyce Fern, and the youngest child, a boy named Perry, resided with her in this home in Lubbock, Texas. The friendship between Joyce Fern and the appellant continued for some period of time and eventually they became very fond of each other. However, prior to meeting the deceased in August, 1952, appellant had become infatuated with a girl named Ulla Lindeborg, who lived in Sweden. While she was in the United States he was very attentive to her and gave her a ring. After she returned to Sweden, he heard from her every two weeks or so until he came to the Reese Air Force Base near Lubbock. After he came to Lubock, he purchased a diamond ring in a jewelry store there and sent it to Ulla at her address in Sweden. However, after he had been at the Reese Air Force Base for a period of time, he became very attentive to Joyce Fern. They had some conversations at different times about the appellant's feelings toward Ulla, the Swedish girl. Since appellant was the only young man who had shown such attention to Joyce Fern, their relationship soon turned into a sort of romance. About this time his relationship with Ulla began to cool, and eventually their romance was terminated. Joyce Fern and the appellant were together almost every school night during the week and usually every Saturday night. Finally she permitted him to go into "petting operations" with her, and he claimed to have had sexual relations with her just a few weeks before her death.

On the 6th day of January, 1953, appellant was informed that he was about to be transferred to San Antonio as a flying cadet. He had previously made application for cadet training and had passed all his examinations and cleared all of his "physicals." He claimed to be close to a nervous breakdown. On the 7th of January, he packed all his clothes that he would not use at San Antonio, and purchased a cotton cord about ten feet in length from a merchant in town with which he expected to tie up boxes in which his clothes were stored and leave them at Mrs. Gardner's house on a certain street in Lubbock. He was supposed to leave on January 8th, so he made arrangements with a soldier friend to borrow his car. He took these boxes to the lady's house and then went by to say good-bye to Joyce Fern.

He drove to her house about a block away from where she worked and saw her walking along the side of the road with a package under her arm. He stopped and she said that she had just come back from the store. She got into the car with him, and they got into a lengthy argument about their marriage. The deceased wanted to be married, but he told her they could not be married because it was against the rules of the Army. They quit their argument and he thought it was settled, so they started away together in the car. She had failed to tell her mother where they were going. About dark, he disposed of these boxes in the car which he had failed to tie up with the cord. He and the deceased drove out on a certain avenue and then back to her house, where they worked on her algebra. Her mother retired about 8:30 o'clock, and Joyce Fern started her argument again about wanting to go to San Antonio with him. They had quite an argument relative to their marriage at that time. Just as he was ready to leave around 9:00 o'clock, it is claimed that she put up a new argument and told him at that time that she was pregnant. Such statement seems to have upset him to a great extent. He became convinced of the fact of her pregnancy and finally agreed to take her to Clovis, New Mexico, immediately and marry her. He claims that this news caused him to have a short black-out which seems to have cleared away and left him dumbfounded. They came to the conclusion that the best thing to do was to get married; that they would drive to Clovis, New Mexico, to be married and he would then go to San Antonio. They decided not to tell the deceased's mother because she might not have been pleased with the idea of their running away, but he agreed to meet her around in back of the house because he did not care to go out in front and have her mother see her get in the car. She got into the car from there and they drove away. They went for quite a distance out in the country and argued some, but then stopped to "do a little loving and so forth." According to his testimony, they took off their clothes and had an act of intercourse in the car. During such time the deceased questioned him relative to his love for Ulla and his love for her as to whether or not the same was greater than his love for the deceased. Finally the deceased made the statement, as claimed by him in his testimony, that she was not pregnant; that she just told him that "to prove to you that you love me more than you love that dumb Swede." She slapped him a couple of times and that this was all he remembered for a period of time. The next thing he knew he was in the front seat with a flashlight looking down and she was lying there on the floor with her face discolored. He reached down and felt of her pulse, but there was none. He then realized

that she was dead, and knowing that dead people should be buried, he thought he would try to find a place to bury her. He then got up and dressed and started out in the car through a back road. This is deemed to be a sufficient resume of his testimony.

On the following day when the deceased did not appear at her home a search was started for her. He appeared at her home and assisted in every way that he could in endeavoring to find out where she had gone. He made the suggestion to her mother, sisters and brothers that she had doubtless gone to San Antonio. This idea was also suggested by him to the officers and others who were looking for the girl, and eventually he went to San Antonio to the air field to which he was assigned, leaving her whereabouts undiscovered. However, the hunt for the girl's body continued and suspicion rested upon him since he was the last person seen with her. Eventually he was questioned by rangers and peace officers and usually gave the same story until at last he was taken into custody by such officers. He then requested the presence of a minister, and the officers procured a Lutheran minister who came and talked to appellant privately. Soon thereafter he told the officers that if they would take him back to Lubbock, Texas, he would locate the spot where he had buried the body of the girl.

He was taken to Lubbock, and after some effort with his own hands, he took a shovel and dug six different holes, five of which produced the clothing that was identified as having been worn by Joyce Fern, her shoes and other paraphernalia, and finally, along a pipe line that had just been laid there, he dug down about four to six feet and there they found the body of Joyce Fern.

There was no contention of any kind that appellant was mistreated by anyone. In fact, his own testimony shows that he was treated at all times with consideration. There were no threats, no importunities, just intermittent questioning, and finally he led them to the spot where this little 18-year-old girl had been buried some 20 days before.

A justice of the peace was called while this body was still in the grave. He held an inquest over the same and ordered an autopsy, but the autopsy, although offered in evidence, was excluded by the court in an excess of caution. However, the testimony of Dr. Marie Shaw, who viewed the body, evidenced the fact that the deceased had met a violent death.

Dr. Shaw testified that she viewed the body of Joyce Fern White on the 28th day of January, 1953, at a funeral home in Lubbock about 10:30 o'clock in the morning. From the external appearance of the body, a gash was found in the left breast thereof about seven and one-half inches in length. This gash was filled with dirt and had evidently been made after death, there being no bleeding in the tissues around the wound. She further testified relative to the appearance of the body as follows:

"A. At the bottom of the neck right above the collarbone, there was a line of demarcation, above which the neck and head were swollen and blue in color, and in the eyelids there was a considerable amount of hemorrhage present with a puffy, swollen appearance to the eyelids and tissues around the eyes. The lips were swollen and protruding and bluish-black, the tongue was blue and swollen and protruding out of the mouth, and the discoloration extended into the scalp and also around the neck, as well as into the face.

"Q. Now, Doctor Shaw, basing your opinion upon your examination of the body of Joyce Fern White and basing your opinion further on your total experience as a medical doctor and as a pathologist, tell the jury what, in your opinion, was the cause of death of Joyce Fern White.

"A. Asphyxia due to strangulation.

"Q. Now, what is asphyxia?

"A. Smothering."

The body was nude at the time the witness saw the same with the excepton of a Lubbock High School ring, dated 1953, which was on her right ring finger.

It is also worthy of note that the cord, being the same one purchased from the merchant by the appellant, was found in the grave with two spots of human blood thereon.

Appellant took the witness stand and testified to practically the same thing that the witnesses for the state had detailed before the jury with this one exception: He claimed that at the time the girl slapped him, that everything went blank, and remained so until he found himself on the front seat of the car, and that he turned a flashlight on the deceased and found that she was dead.

Appellant objected to the introduction of the statement made by him to the officers while under arrest and not warned on the ground that same was in violation of Article 727, Vernon's C.C.P., and was in the nature of a confession. It is the contention of the state that same was a voluntary statement of the accused and therein he made "statements of facts or circumstances that are found to be true, which conduce to establish his guilt, such as the finding of secreted or stolen property, or the instrument with which he states the offense was committed."

Unquestionably, at the time appellant made the statement, diligent search was being made for the deceased, not only at her local habitation, but also in San Antonio, the place suggested by the appellant to which she might have gone. Undoubtedly, he knew at the time, and later so testified, that she was then lying in a grave out in a field near Lubbock and was not on her way to San Antonio or any other place. If the statement had not been made by him, time alone could tell whether her body would ever have been discovered or her clothing ever been found, both having been buried in the earth.

We think the confession would be admissible alone upon the fact of its coming within the provisions of Art. 727, C.C.P.

There is but one other defense offered before us in argument and enlarged upon in the brief, and that is the defense of amnesia. In Webster's New International Dictionary, Second Edition, "amnesia" is defined as the "loss of memory due to brain injury, shock, fever, repression, etc.; also a gap in one's memory."

This defense, if such there be, was based upon the proposition that appellant said that he remembered nothing after the girl slapped him until he raised up with a flashlight and saw her body. The only testimony in the case relative to amnesia, save that of the appellant, is that of Dr. Raymond A. Lemee, who, after having been propounded a lengthy hypothetical question dealing with practically the whole situation as testified to by the appellant, gave the following testimony:

"Q. *** I will ask you, Doctor, assuming all of those facts which I have just related to be true, is that such a condition as would probably or could bring about amnesia? A. May I ask one question?

"Q. Surely. A. Perhaps I wasn't clear. The woman who was referred to as a 'bum' or a 'dirty Swede,' was that the girl that he loved?

"Q. Well, that - - - that he really loved in the spiritual manner as he's described it. A. All of those things assumed, one would have to say that amnesia very definitely must be considered, and all of them being true, I think a strong possibility of amnesia could exist."

This doctor did not attempt to qualify as a psychiatrist, but merely testified as a physician, that he had had but little experience in psychiatry, according to his own statement, and did not hold himself out as a person who had specialized in the study of the nervous system, that being a science in itself with which he had not familiarized himself. Under his own statement as it is offered here, it leaves us in doubt as to whether or not the defense of insanity includes itself in the claimed temporary amnesia. In any event, the prudent and careful trial judge submitted in his charge the defense of insanity and instructed the jury, among other things, that if the deceased met her death at the hands of the appellant as alleged by the state, then he charged upon insanity resulting from amnesia or from any disease of the mind or any form of insanity, and we find no objection thereto lodged at the court's charge. However, in the motion for new trial, as well as in the brief and argument presented to this court, we find an objection made to Paragraph 8 of the court's charge. Bearing in mind the fact that the oral statement of the defendant which was introduced in evidence over the appellant's objection, which carried with it an attempt to show that said statement was not freely and voluntarily made by the defendant and might have been induced by duress, threats, coercion, etc., the trial court instructed the jury as follows:

"You are instructed that you cannot consider the oral statement of the defendant, which has been introduced into evidence, for any purpose in this case, unless you first find from the evidence beyond a reasonable doubt, that said statement is true, and irrespective of a finding by you of the truthfulness thereof, unless you further find from the evidence, beyond a reasonable doubt, that said statement was freely and voluntarily made by the defendant, and further, in order that said statement be valid and considered by you as any evidence against the defendant in this case, same must not have been induced by duress, threats, coercion, fraud, persuasion, promise or hope of reward, or fear

of violence to his person in the event he did not make such oral statement, and even though you believe beyond a reasonable doubt, that said oral statement was made by the defendant freely and voluntarily, you must further believe and find beyond a reasonable doubt, that there is other evidence in the case that tends to corroborate the same."

In the first place, we are of the opinion that this charge carefully laid before the jury the proposition that before they could use this statement of the defendant, they must find that it was true, and in conjunction therewith determine its truthfulness, that they must further find that it was freely and voluntarily made by the defendant and not induced by threats or coercion, and even then, they must also believe beyond a reasonable doubt that it was freely and voluntarily made, and not only then, but that there was also other evidence in the case which tended to corroborate the same.

We think the court was over-solicitous, perhaps, in the admission of the statement that was clearly justified as such, and no attack made thereon save the fact that it was made by the appellant to the officers who had him in custody, and therein the court endeavored to guard every right of the appellant in this charge to the jury. We observe, however, that no objection was leveled at the charge, appellant evidently being satisfied therewith at the time of its delivery.

There are many informal bills in the record which are not presented to us, either in the brief or in the argument, but we do find certain formal bills of exception which we will attempt to discuss.

Bill No. 4, which was taken during the progress of the trial, complains of the testimony of Grady Harrist, Sheriff of Lubbock County. After detailing at great length the testimony that was offered by the appellant, as well as that offered by the state, the question was then asked the witness as follows:

"So far as you know, there is absolutely no motive in this case for this --- the death of this girl?"

This question was objected to by the district attorney as follows:

"Your Honor, I object to that question; it invades the province of the jury."

We think the court was correct in sustaining the objection and declining to permit the witness to answer the question of whether there be a motive or not, that matter being one within the province of the jury alone. However, motive is a convenient thing but not always a necessary one.

In Jones v. State, 153 Texas Cr. Rep. 345, 220 S.W. (2d) 163, this court held:

"Motive, while useful, is not necessarily to be shown in estimating an offense such as the one under investigation," citing 12 Texas Jur. p. 254, sec. 32.

See also Holland v. State, 152 Texas Cr. Rep. 552, 216 S.W. (2d) 228; Fox v. State, 95 Texas Cr. R. 220, 253 S.W. 294; Rea v. State, 77 Texas Cr. R. 565, 179 S.W. 706.

Bill No. 5 relates to the claimed error on the part of the trial court in admitting the evidence of Dr. Marie Shaw, a witness for the state, concerning her examination of the body of the deceased in connection with the alleged inquest held by the justice of the peace. It is the appellant's contention that the testimony was inadmissible because the so-called inquest proceedings were illegal and void and that, therefore, the evidence of the doctor was illegally obtained, and tenders Art. 727a, C.C.P., in support of such contention.

The testimony shows that Dr. Marie Shaw was a pathologist and examined this body in pursuance of the order of the justice of the peace as above set forth. In his ruling thereon, the court refused to allow the witness to show any matter that she might have ascertained by virtue of the autopsy upon the body of this deceased girl. She merely testified to what she observed by looking at the body as it lay in the funeral home. There is nothing in her testimony to show what she found upon the autopsy that was authorized, improvidently so the appellant says, by the justice of the peace. Any witness who had eyes could see the same thing as this doctor claims to have seen at the time that she viewed the body of the deceased. The state therefore offered no testimony relative to any autopsy made of the deceased, and we see no error shown in the doctor's testimony as found in the record.

It is suggested that the corpus delicti in this cause has not been properly proven. "Corpus delicti" means "the body of the crime," whatever offense it might be, and under the facts herein proven, we are of the opinion that the state showed that Joyce

Fern White came to her death by means of violence applied to her body. The testimony itself evidences the fact that the appellant was the last person seen with her during her lifetime; that appellant was present at the scene and time of her death and entombed her body.

In the early case of Kugadt v. State, 38 Texas Cr. R. 681, 44 S.W. 989, in a very comprehensive opinion, Judge Hurt laid down the proposition that the confession of an accused could be utilized as a circumstance to evidence a death by violence, and also to show by whom the violence had been inflicted. From the opinion we quote as follows:

"A confession is sufficient, if there is such extrinsic corroborative circumstances as will, taken in connection with the confession, produce conviction of the defendant's guilt in the minds of a jury beyond a reasonable doubt.

"Such suppletory evidence need not be conclusive in its character. When a confession is made, and the circumstances therein related correspond in some points with those proven to have existed, this may be evidence sufficient to satisfy a jury in rendering a verdict asserting the guilt of the accused. 'Full proof of the body of the crime, the corpus delicti, independently of the confessions, is not required by any of the cases; and in many of them slight corroborating facts were held sufficient.' 3 Am. & Eng. Enc. Law, p. 447. We take it that there can be no question that the prosecution is permitted to prove by circumstantial evidence the corpus delicti, and in aid thereto use (the) confession of the appellant."

The Kugadt case has been looked upon as the leading authority relative to the doctrine that in the establishment of the corpus delicti, the confessions are not to be excluded, but are to be taken in connection with the other facts and circumstances in evidence. See Alexander v. State, 151 Texas Cr. R. 235, 207 S.W. (2d) 881; Saulter v. State, 151 Texas Cr. R. 550, 209 S.W. (2d) 184; Watson v. State, 154 Texas Cr. Rep. 438, 227 S.W. (2d) 559.

Under the facts and circumstances present in the instant case, we think it can be safely said that the appellant choked Joyce Fern White to death with a cotton cord around her neck. As to whether or not he was conscious of the same and was in a sane frame of mind at that time was a question for the jury to determine, as well as the punishment to be accorded in the event they decided against him. This was presented in the unobjected to charge. While the killing is to be regretted, we can only say

that the jury were within their province when they allotted to him the penalty of death.

Thus believing, and no error having been presented to us, the judgment will be affirmed.

### ON APPELLANT'S MOTION FOR REHEARING

WOODLEY, Judge.

Upon original submission appellant predicated his appeal upon six points, three of which are re-urged in his motion for rehearing, namely:

1.  The insufficiency of the evidence to show that the homicide was committed by the means, and in the manner alleged in the indictment.

2.  The error of the court in admitting the evidence of Dr. Shaw concerning an autopsy performed on the body of the deceased, over the appellant's timely objection that a legal inquest had never been held, and in the absence of which, evidence obtained as a result of the autopsy was inadmissible.

3.  The error of the court in giving to the jury the instructions contained in Paragraph 8 of the charge (quoted in our original opinion and submitted as fundamental error).

We will attempt to comply with appellant's request that we set out the testimony which. we find in the record to support our conclusion that the evidence is sufficient to sustain the allegation of the indictment ·  ι  ᵗʰe appellant killed the deceased by strangling her with ᵗᵪ  ᵣⁱ  ᵇn cord.

It is to be remembere(  ᵗ the state relied upon circumstantial evidence to prove ι  ;ct that appellant killed the deceased, as well as to prove  manner and means used in the killing.

The statement of appe  t and his actions in leading the officers to the body of th'  eceased and her buried clothing, though in the nature of a ·  fession, did not constitute an admission that he killed the  eased, nor that he used a cotton cord in doing so, or in fact  it he inflicted any serious injuries upon her.

He did admit to the officers that after he had slapped the deceased and had been slapped by her, he next saw her in the back of the car by the aid of a flashlight and saw that the deceased "had a cord around her neck several times"; that she was black in the face and blood was oozing out of her mouth.

Appellant had purchased about ten feet of cotton cord at a hardware store in Amarillo late that afternoon. He disposed of the packages which he claimed were to be tied, but the cord was in the car when he drove Joyce to the lonely spot where she met her death. He buried some of her clothing, then her body. He then gathered the remainder of her clothes and the cotton cord and buried them at another place. When he led the officers to the spot and dug up these articles the cord had spots of blood on it which was of human origin.

Referring to the articles he buried after he had removed the body of the deceased from the car, which articles included the cotton cord, he testified that he wanted to get rid of everything that had to do with Joyce. The cotton cord was the only article he buried that did not belong to the deceased.

Dr. Shaw gave testimony as to the appearance of the head and neck of the deceased's body and the cause of her death, as quoted in our original opinion. She also testified: "I have summarized to you the appearance of her head and neck, which were swollen and blue, and the appearance of hemorrhages in the soft tissues around her eyes and her lips and mouth. Also, the fact that she had - - these changes started from the bottom part of her neck, around her neck, and including the top of her head and neck are all positive evidences of strangulation and - - around the neck and the subsequent cutting off of the air, which would be smothering or what we call asphyxia."

We held on original submission that the doctor's testimony was admissible. If it was, the testimony above mentioned, together with that set out in our original opinion, is sufficient to support and sustain the finding of the jury that appellant killed the deceased by strangling her with a cotton cord, as charged in the indictment.

We pointed out in our original opinion that no testimony was introduced as to any autopsy made of the deceased. Whether such be an essential or not, an autopsy is more than an inspection and usually includes a partial dissection of the dead body.

The question of the availability of testimony given at the inquest, or acts or findings of the magistrate is not before us. The doctor testified as to what she observed in her examination of the body and we hold that it was not incumbent upon the state to prove that a legal inquest or autopsy was held, as a predicate to the admission of such evidence. It was not evidence unlawfully obtained.

Our view as to Paragraph 8 of the court's charge, which is set out in our original opinion, is that it does not under the facts here authorize a reversal. As we view this instruction, the trial court was attempting to protect appellant's rights in the event the jury should construe appellant's statement to the officers as a confession and should entertain a doubt as to its voluntary nature. Viewed in this light it was more favorable to the accused than he was entitled to.

When the court's charge containing Paragraph 8 was presented to appellant's counsel, he filed no objection calling the trial court's attention to his use of the term "oral statement" and to the possibility of the jury applying the instruction to appellant's testimony or to statements that were not in the nature of a confession.

Had this been done as the law contemplates, or had appellant expressed a dissatisfaction with the charge, it would no doubt have been amended. If not appellant would have been in position to present the matter for review.

Remaining convinced that the appeal was properly disposed of on original submission, appellant's motion for rehearing is overruled.