John Lewis WILDER and Artie
Armour, Appellant,

v.

The STATE of Texas, Appellee.

No. 57848.

Court of Criminal Appeals of Texas,
En Banc.

Jan. 31, 1979.

Rehearing En Banc Denied April 4, 1979.

Jerry L. Davis, New Boston, on appeal only, for Wilder.

James E. Davis, Texarkana, for Armour.

Lynn Cooksey, Dist. Atty. and Donald W. Dowd, Asst. Dist. Atty., Texarkana, for the State.

## OPINION

DOUGLAS, Judge.

Appellants Armour and Wilder were convicted in a joint trial for the offense of capital murder. Each appellant's punishment was assessed by the jury at death.

The State alleged and proved that Wilder robbed and shot the deceased, Duane Jaixen, a 19-year-old night attendant at an Exxon Station in Hooks at about midnight on December 23, 1975. Armour was found to be a party to the offense. See V.T.C.A., Penal Code, Section 7.01.

Pat Grady testified that at about one o'clock a. m. on December 23 he and his brother-in-law, Dwight Carr, stopped at the Exxon Station in Hooks for gasoline. As Carr was pumping gasoline Grady looked inside and saw this boy in a slumped position beside a Christmas tree. Carr came inside and the two saw that the boy was vomiting a little. Carr tried giving mouth to mouth resuscitation.

Dwight Carr testified that, when they arrived at the Exxon Service Station in Hooks, he saw that the young man had been shot and was sitting on the floor in a slumped position. Carr laid him back on the floor and determined that he had a pulse. After trying to seek aid on his C.B. radio, he called the operator for assistance. He then attempted mouth to mouth resuscitation but the young man kept vomiting.

Jake Jaixen testified that he resided in Hooks and that his son, 19-year-old Duane Jaixen (the deceased), worked at the Exxon Station in Hooks as a night attendant and was so employed on the night of the murder.

Terry Watlington, Chief Deputy Sheriff of Bowie County, testified that he went to the Exxon Service Station in Hooks at ap-

proximately 1:00 a. m. on the night in question and saw Duane Jaixen lying on the floor of the station with two bullet wounds—one in his chest area and one in the stomach area.

Dr. Robert Hart Chappell, whose qualifications as a pathologist were admitted, testified that he performed an autopsy on the body of Duane Jaixen. He found a bullet wound in the chest and another bullet wound in the stomach and that the bullet in the chest area exited the body. The other bullet that entered the stomach region did not exit the body but was found lodged against the backbone.

R. M. Arnold, a Texas Ranger, testified that he investigated the homicide and determined that the bullet was fired from a .38 caliber pistol.

B. C. Sustaire, Chief of Police of Mount Pleasant, testified he, Officer Johnny Thomas and Wilder went to Artie Armour's house and that Wilder got the .38 caliber pistol from Armour, unloaded it and handed it to him (Sustaire). It was later shown that the bullets found in and near the body of Duane Jaixen were fired from this gun. After it was determined that the fatal shot was fired from this gun, a warrant was issued for the arrest of Wilder and Armour. When Armour was arrested, a television set taken during the robbery and homicide was found at Armour's home.

The confession of Armour was introduced. There was no issue made as to its voluntariness before the jury. The court had sufficient evidence to conclude that it was admissible. It reads (omitting the formal parts) as follows:

"'I understand what Judge Ben Grigson has told me. I understand the warning and I still want to talk to you and tell you the truth. I don't really remember the date we came up here, December 22nd or 23rd. By we, I mean John Wilder, Robert Lovelace and myself. . . .'

"* * *

"'. . . We were on our way back home to Mt. Pleasant. We had come from Mt. Pleasant to Texarkana. John rode by his girlfriend's house.'

"* * *

"'I don't know her name, I think it is Harris or something. She is kind of skinny. We stayed over at her house for a little while and then rode around. We were in John's mother's car, a black Torino, Ford. '68 or '69, I think was the year. We rode around and went back home. We went back to Mt. Pleasant on Interstate 30. John pulled over to the service station, he was driving. John said he was going to get gas. We drove past the station that had diesel trucks parked in it, we turned around in the truck stop parking lot then we drove over to the next service station right across the street. I don't know what kind of service station. We drove across the street from the truck stop. I don't remember what the name of the truck stop was. We stayed in the street, not the service station lot. We didn't stop at the first service station. John drove on past the second service station. I don't know exactly how many yards. You could see the service station from there. He drove past the station and stopped. John told me to get behind the wheel and he got out of the car walked into the station because it was on up a little bit further. He said he was going to hit it . . that meant to me that he was going to rob it. After John got out I moved the car farther from the station. John stayed a minute maybe two minutes. He came back out with a TV in his hand and money in his pocket. He took the money out of his pocket and showed it to me. He didn't let Robert see it, though. He had his gun inside his coat. He held the gun up against my nose and told me to smell it and I did and it smelled like it had been fired, the gun barrel had been fired. We were talking real low and John said he had to shoot him. He said he was acting allright at first but he was going to try to run and John said he had to shoot him. He said he had to shoot him two times. He threw the hulls out the window on Interstate. A pretty good piece up the road. He

threw the hulls out of his gun through the passenger side of the car. When John got in with the TV he told Robert he had got him a TV and Robert asked him if he ripped the man off and John said no he had bought it from him for $.45 and Robert said that he thought that he had ripped the man off. We kept on going home and I started thinking about it and kind of figured he was lying about shooting him. We got off the Interstate on a Farm to Market Road to Naples and came on home. All 3 of us went to my house. We got out and went inside and drank some beer. John got up and went out to the car and got the TV and gave it to me and told me "Here, Merle, he calls me Merle, you can have the TV you have been needing one." We split up the money 70 something dollars. I was supposed to get half of the money. Robert didn't get nothing. I think Robert suspected something because he asked me if John stole that TV and I said probably knowing him. That was the same TV that they found at my house, the same one that John got at the service station and the same TV that the officers took from my house on February 19, 1976. John had a .38 pistol. I didn't have the other pistol with me, it was at my house. We parked on the street by the service station already going up to the Interstate. I forgot what time of night it was. We had gone riding around in Texarkana on Lake Drive we went by Brenda's house, a (Used to be) girlfriend of mine, and her mother said she was asleep. Me, John and Robert went there and then we went riding around in Arkansas. No cops stopped us that night. I know kind of where John's girlfriend lives where we were earlier. Same area as my uncle lives. I think I could take the officers there. I don't remember the time of night we was at the service station. We hadn't talked about doing it before we got to Hooks. We knew we was going to divide the money in half. Before John went in the service station he just said he was going to pull in and get some gas. We turned around then we saw that the

boy was in the station by himself. The boy was white and kind of chubby looking to me. We didn't pull through the service station parking lot. We stayed on the street. There were no other cars at the station. I didn't hear any shots. We didn't meet an ambulance coming back on Interstate. I went to High School, 11½ years. I can read and write. The Social Security Card I have is No. 464 17 0292. I am 21 years of age and my date of birth is October 10, 1954. I never got out of the car at the service station. All I did was drive. I never saw John pull his gun. I never saw him take it out. He was carrying his gun inside his pants kind of in front and had his coat around it, with the barrel down in his pants. John told me he had to shoot him twice, once in the chest and once in the stomach. I couldn't see from where we were parked inside the service station. John said he had to shoot him twice because he was trying to run, he said he acted allright at first but then he tried to run away, tried to get out and John had to shoot him. John told me "I had to kill him because he was trying to run from me." I got 70 something dollars and when John got in the car he told me that he robbed that service station and had this TV in his hand. When he got in the car he acted normal, cool. We had been drinking. We bought the stuff to drink in Monticello. John shot him after he got the money. I don't know whey (sic) he had to shoot him in the chest and the stomach because he was trying to run. That is what John said. I had never seen this man in the service station before. John said that he didn't know him one day when we was sitting at the house and I said I was sort of worried about it and John said that "it didn't bother him much, because that guy in Texarkana I didn't know him." I have never pulled a job in Texarkana. John never has pulled a job in Texarkana, not with me anyway. He took the shells out of his gun it holds six.' "

The confession of Wilder (omitting the formal parts) reads as follows:

" 'We, Robert Lovelace, Artie Burl Armour and myself we came to Texarkana about three days before Christmas. We was going to see Artie's girl by the name of Brenda Cartwright but she wasn't at the same place Artie thought she was so we went to my girlfriends and my ex girlfriends, Emma James. We talked there for at least 20 or 30 minutes. Robert Lovelace he didn't know anything about anything. He was just in the car with us. Anyway we was drinking gin and some beers and I think Robert got high or drunk because he was leaning over. We decided to go back to see Carolyn Harris, my girlfriend but she was home but asleep so we left her house about 11:30 or 12:00. We got on Interstate 30 instead of taking the old highway home. Artie said "Well are we going to do it". I said we couldn't with Robert in the car. Artie said "Oh he is asleep anyway. So I said it was up to Artie and about that time my car started running hot and I needed to get some water. We went to this truck stop and turned there it was beside Interstate 30. We turned there and went up the lot to get back on the Interstate. Artie said "Stop there is a guy over there and he is by himself" so we stopped. I looked over there and there wasn't nobody in there but him. I couldn't tell you how old he was or what he looked like. He was white. So after we went over there Artie offered me his little gun. It was a .22 but it looked like a .32. I took my gun, I didn't want Artie's he had borrowed it from some guy and I didn't want to get that guy in trouble. So I went in the service station and my gun was in my belt. I had my shirt over my gun. I walked in there and asked him where was the bathroom and he said the bathroom was outside and then I pulled my gun and he made a quick move, he flinched, and I shot him once. I was just intending to rob him. I walked in intending to rob him. He looked like he was fixing to make a move and I shot him. I was about 3 steps away from him when I shot him. I shot him in the front. I didn't have any money at that time. He grabbed his side and stumbled into the backroom. Then I started punching the keys on the cash register trying to get it to open, I pulled the lever on the side and it didn't open. I went to the guy and I said open this thing. He wasn't dead. He was holding his side. He opened the cash register and I got the money out I put the money in my pocket, my pants pocket. I could see a spot of blood on his shirt after the first shot. Got the money out and put in my pocket then I reached up and snatched the TV and kept going. I shot him going out the door. He was crawling up under the desk on his right side. I shot back at him twice—"Pow, pow." I was about 6 feet away from him, I was in the doorway. I shot him twice, "Pow, pow." He was already down when I shot him the last two times. He was on his back in the floor after I shot him. When he was laying down on his right side before I shot him the last two times, he was still holding his side with his hand and I turned back around and shot him two more times. He was reached up under the desk with his other hand. I don't think the first shot hit him but the second shot hit him. I just have that feeling that you get in your head that the second shot hit him. He didn't moan, he didn't groan. It was just that feeling that you have in your head that you hit somebody. I hit him in the chest with the second shot. I was too busy running to see if he made any movement. I am left-handed. I was shooting with my left hand and carrying the TV with my right hand. The second shot hit him and I turned and ran. I run to the car to my mother's car and Artie was at the steering wheel. Artie said "Where did you get the TV from?" "The guy was nice enough to give me a TV." I put the TV in the car and got in. In other words Artie was driving the getaway car. Robert didn't know anything about it. I don't think he did because he never acted like it. I never have liked him anyway. He ain't done nothing. We were in the car and Artie said "Did you get it?" and I

said I had got the TV and a little money. I didn't say nothing about no killing then. I didn't think I had killed him. But I had that feeling that I did hit him. After we got to Mt. Pleasant we went to Artie's house. Artie drove. We took Robert home and put Robert out. Robert had to be kind of high because he got out and he staggered. We went to Artie's house. After I got in the car I took the money out of my pocket and handed it to Artie and he put in his coat and he said "Yeah we done went to work again tonight?" and I said "Yeah and I get the blame for it." Artie said "Yeah we keep on selling dope like this" trying to cover up so Robert wouldn't know. I wasn't drunk because I don't get drunk. I told Artie that night that I didn't know if I had killed him or not and that I wanted to listen to the radio to see if I had. So I went to Artie's the next day and I heard on the radio the guy was dead. I said to Artie "Well, he died" and Artie said "It couldn't be helped." We got about $100.00 because he got $50.00 and I got $50.00. Robert didn't get nothing. We halved the money all the way. Me and Artie planned the job together and pulled the job together and if I should go to jail then he would go with me.' "

Appellants offered no evidence.

The physical evidence showed a murder. Each confession was sufficient to connect each appellant to the crime. The confessions fit the details of the fact that Wilder killed Duane Jaixen by shooting him with a .38 caliber pistol. Wilder's confession shows that he shot Jaixen in the chest and in the stomach. Armour's confession reflects that Wilder told him that he shot the attendant in the chest and in the stomach. The testimony of the pathologist was that Jaixen had been shot in the stomach and in the chest.

In his first ground of error, Armour alleges that the evidence was insufficient under Article 37.071, V.A.C.C.P., to show he either caused the death of the deceased or committed the act deliberately and with the reasonable expectation that death would re-sult because he did not actually kill the deceased.

V.T.C.A., Penal Code, Section 7.01, provides in part:

"(a) A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

"(b) Each party to an offense may be charged with commission of the offense."

V.T.C.A., Penal Code, Section 7.02, provides in part:

"(a) A person is criminally responsible for an offense committed by the conduct of another if:

" * * *

"(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other to commit the offense;

" * * *

"(b) If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy."

In *Livingston v. State,* 542 S.W.2d 655 (Tex.Cr.App.1976), it was held that Sections 7.01 and 7.02 apply to V.T.C.A., Penal Code, Section 19.03 and Article 37.071, V.A.C.C.P., and therefore a defendant could be convicted of capital murder even though the deceased was killed by the co-defendant during the course of a robbery. See *Smith v. State,* 540 S.W.2d 693 (Tex.Cr.App.1976); *Thompson v. State,* 514 S.W.2d 275 (Tex.Cr.App.1974). The evidence introduced clearly shows that Armour was a party to the offense. He was, in effect, the "wheel man." In his confession he admits he

parked the car on the street instead of the station parking lot, knew in advance he and Wilder were "going to divide the money in half", and received his share of the money as well as the television. Moreover, at the punishment stage, a second statement by Armour was introduced in which he admitted participating in another capital murder only two days before the murder for which he was tried. Viewing all the evidence in the light most favorable to the jury's verdict, we conclude the evidence was sufficient to sustain the jury's finding.

It is also contended that the imposition of the death penalty under Article 37.071, V.A.C.C.P., constitutes cruel and unusual punishment as applied to Armour because he did nothing to deliberately cause the death of the deceased.

This question was addressed in *Livingston v. State,* supra, and rejected by this Court. See also *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Jurek v. State,* 522 S.W.2d 934 (Tex.Cr.App.1975).

In two separate grounds of error both appellants complain that the trial court committed reversible error in denying their motion for severance and in admitting their confessions because the evidence was hearsay and denied them their rights of confrontation and cross-examination.

In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), relied on by appellants, the Supreme Court of the United States held that the admission of a confession of a codefendant who did not take the stand deprived the defendant of his confrontation right under the Sixth Amendment if that confession implicated the defendant. An instruction to the jury to consider the confession only against the declarant was deemed to be insufficient to remove the danger of misuse by the jury.

In *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), the defendant was charged with murder and tried jointly with his co-defendant. Witnesses were allowed to testify to statements made by the defendant in which he initially denied but later admitted attempting to strangle the deceased. He also stated that following this his co-defendant shot the deceased. His co-defendant confessed that he had shot the deceased because she showed signs of life after the strangulation. Finding that his co-defendant's statements merely corroborated certain details of the defendant's own confession, and noting that the independent evidence of guilt was overwhelming, the Court held that any *Bruton* error in the admission of the co-defendant's confession was harmless. See *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). The Court stated that "unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required." See *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ The duty of the appellate court is to determine this on the basis of its own reading of the record and "the probable impact . . . on the minds of an average jury," . . . *Schneble v. Florida,* supra. In the case at bar, although Wilder's statement included several remarks attributed to Armour not found in Armour's confession, the State's case against Armour would not have been less persuasive without Wilder's confession. Armour admitted driving the car on the night in question and stated that immediately before the robbery,

". . . John told me to get behind the wheel and he got out of the car walked into the station because it was on up a little bit further. He said he was going to hit it . . that meant to me that he was going to rob it. After John got out I moved the car farther from the station. John stayed a minute maybe two minutes. He came back out with a TV in his hand and money in his pocket. He took the money out of his pocket and showed it to me. He didn't let Robert see it, though. He had his gun inside his coat. He held the gun up against my nose and told me to smell it and I did and it smelled like it had been fired, the gun

barrel had been fired. We were talking real low and John said he had to shoot him."

Armour also admitted receiving the television and $70 from the robbery. Similarly, Wilder's confession admits his complicity in the robbery—murder, and Armour's does not add any material elements.

■ Aside from the statements of the appellants, the independent evidence is more than sufficient to connect them with each other and the murder. Wilder led police to Armour's house and recovered the murder weapon there. Moreover, not only was the pistol found in Armour's house, but the television taken in the robbery as well.

In *Bass v. State*, 527 S.W.2d 556 (Tex.Cr. App.1975), the confessions of the three defendants were introduced. Two of the defendants admitted participating in the planning of the robbery and its actual commission. Although their convictions were reversed on other grounds, we held the *Bruton* error was harmless because

"[T]hey are substantially similar in nature, essentially corroborate, interlock and support each other as to the offense charged—the murder of Hubert Simmons. The confessions were merely cumulative of overwhelming independent evidence which showed that Haynes and Bass were acting together during the course of the robbery in which the deceased was beaten and killed."

In *Schneble v. Florida,* supra, the Supreme Court, noting that the defendant's confession was minutely detailed and completely consistent with the objective evidence, held that the statements of his co-defendant "at most tended to corroborate certain details of petitioner's comprehensive confession." The Court then stated:

"Judicious application of the harmless-error rule does not require that we indulge assumptions of irrational jury behavior when a perfectly rational explanation for the jury's verdict, completely consistent with the judge's instructions, stares us in the face."

■ The granting of a motion for severance is within the trial judge's discretion unless one defendant has a prior admissible conviction or a joint trial would be prejudicial to any defendant. Article 36.09, V.A.C. C.P. See *Jackson v. State,* 504 S.W.2d 488 (Tex.Cr.App.1974); *Robinson v. State,* 449 S.W.2d 239 (Tex.Cr.App.1969).

■ We conclude that the admission of the appellants' statements was harmless error beyond a reasonable doubt and that the trial judge did not abuse his discretion in overruling appellants' motion for severance because no harm is shown.

Next, appellants urge reversal because they were ordered to submit to a pre-trial psychiatric examination before counsel had been appointed for them.

Article 46.02, Section 3(a), V.A.C.C.P., provides that:

"At any time the issue of the defendant's incompetency to stand trial is raised, the court may, on its own motion or motion by the defendant, his counsel, or *the prosecuting attorney,* appoint disinterested experts experienced and qualified in mental health or mental retardation to examine the defendant with regard to his competency to stand trial and to testify at any trial or hearing on this issue." (Emphasis added).

At the trial, Larry Evans, District Attorney of Camp County, where the appellants were apprehended, testified that one of the purposes for obtaining the motion was to determine if appellants were competent to stand trial. He stated that his opinion was formed by his observations of their general demeanor, callousness, lack of concern and complete lack of remorse.

■■ A psychiatric examination is not an adversary proceeding; its sole purpose is to allow an expert to form an opinion as to the accused's mental condition. *Stultz v. State,* 500 S.W.2d 853 (Tex.Cr.App.1973). The court may appoint a disinterested expert at his discretion and without motion. *Granviel v. State,* 552 S.W.2d 107 (Tex.Cr. App.1976).

■ A case closely in point is *Gholson v. State,* 542 S.W.2d 395 (Tex.Cr.App.1976),

cert. denied 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084 (1977). There a psychiatrist interviewed the defendants at the insistence of the State and without the defense attorneys being advised or present at the interviews. The State listed as its purposes a determination of the defendants' competency to stand trial, and partly to do a "psychiatric examination." Neither insanity nor a lack of competency to stand trial was urged by the defendants.

This Court held that the examining psychiatrist properly testified in the State's case in chief and that the examination without presence or notice of counsel did not violate the defendant's Sixth Amendment rights. See *Armstrong v. State,* 502 S.W.2d 731 (Tex.Cr.App.1973); *Patterson v. State,* 509 S.W.2d 857 (Tex.Cr.App.1974). In addition, we have consistently held that the absence of counsel during a psychiatric examination does not violate the defendant's Fifth Amendment privilege against self-incrimination. *Livingston v. State,* 542 S.W.2d 655 (Tex.Cr.App.1976), cert. denied 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250; *Gholson v. State,* supra. See *United States v. Cohen,* 530 F.2d 43 (5th Cir. 1976).

In the instant case, counsel had not yet been appointed for appellants when the examination was ordered and occurred. If there was any violation of due process as appellant contends it was surely less than that sanctioned in *Gholson.*

We conclude appellants' rights were not violated by the ex parte order for a psychiatric examination nor were their Fifth and Sixth Amendments rights violated in the process.

Appellants contend that it was improper to admit into evidence a .38 caliber pistol and television set because the items were obtained as a result of a custodial interrogation of Wilder at a time when he had not been given his *Miranda* warnings.

The admission of tainted evidence may be harmless beyond a reasonable doubt. *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *United States v. Tremarco,* 475 F.2d 157

(3rd Cir. 1973); *United States v. James,* 153 U.S.App.D.C. 404, 473 F.2d 115 (1973); *Cannito v. Sigler,* 449 F.2d 542 (8th Cir. 1971); *United States v. Pardo,* 436 F.2d 968 (5th Cir. 1971); *Brown v. Beto,* 425 F.2d 246 (5th Cir. 1970); *Erving v. Sigler,* 413 F.2d 593 (8th Cir. 1969).

In *Bridger v. State,* 503 S.W.2d 801 (Tex.Cr.App.1974), this Court held that, where there was a voluntary confession and eyewitness testimony, the admission of fruits of an illegal search was harmless beyond a reasonable doubt. See *Gibson v. State,* 516 S.W.2d 406 (Tex.Cr.App.1974). Also *Clemons v. State,* 505 S.W.2d 582 (Tex. Cr.App.1974); *Holcomb v. State,* 484 S.W.2d 938 (Tex.Cr.App.1972), hold that the admission of evidence illegally seized was harmless beyond a reasonable doubt.

The error, if any, was harmless beyond a reasonable doubt.

In addition to the harmless error for showing the jury the pistol used in the robbery, Wilder did not have standing to object to a search of Armour's house where the television taken during the robbery was found. There is nothing in the record to show that Wilder was present at the house when it was found. He had given the set to Armour. Once a thief has taken property and given it to another, he cannot complain of the search of a place not his own. Armour consented to the search of his house.

Armour has no standing to complain of the officers getting information from Wilder concerning the pistol used in the robbery. Armour was not with Wilder during the discussion about the pistol. Armour was not in custody and does not claim that he was at any time before the officers took the pistol. Wilder asked Armour for the pistol, got it, and then gave it to the officers.

In *Brown v. State,* 476 S.W.2d 699 (Tex. Cr.App.1972), this Court held that Brown did not have standing to question the search of an alleged accomplice's car in which stolen goods were found. See *Schepps v. State,* 432 S.W.2d 926, 932 (Tex.Cr.App. 1968).

The Supreme Court of the United States wrote in *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1961), as follows:

". . . one must have been a victim of a search or seizure . . . as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else."

In *Wong Sun v. United States,* 371 U.S. 471, 492, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Court upheld the admission against Wong Sun of narcotics seized from Yee as the result of the illegal arrest of Toy.

*Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), held that only those whose Fourth Amendment rights have been violated have standing to object and held that "co-conspirators and codefendants have been accorded no special standing." See also *Holcomb v. State,* 484 S.W.2d 938 (Tex.Cr.App.1972), and *Holcomb v. State,* 484 S.W.2d 929 (Tex.Cr.App.1972).

In the recent case of *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387, 24 Crim. L. Reporter 3009 (1978), the Supreme Court of the United States specifically declined to extend its ruling in *Jones* to any criminal defendant at whom a search was directed. The Court rejected the notion that one "legitimately on the premises" has standing to object to the search. It held that an accused who has neither a proprietary nor a possessory interest in the premises searched or property seized, nor a legitimate expectation of privacy in the area searched, cannot assert that his Fourth Amendment rights were violated. Accordingly, the Court found that the petitioners, who were passengers in an automobile owned by another and which was searched in connection with a robbery, did not have standing to contest the lawfulness of the search.

In *Granza and Ferrera v. United States,* 377 F.2d 746 (5th Cir. 1967), cert. denied 389 U.S. 939, 88 S.Ct. 291, 19 L.Ed.2d 292, it was held that an accused did not have standing to claim a violation of the Fourth Amendment right of a co-conspirator. The search of a room in which the accused had no interest resulted in finding incriminating evidence, but they could not complain of the search.

In short, Armour cannot complain of the introduction of the pistol. Armour was not in custody when Wilder told the officer that he had a pistol. None of his rights were violated. Wilder cannot complain of the search of Armour's house. There is no showing that Wilder told the officers before the arrest of Armour that they had taken a television set during the robbery.

■ The next contention in effect is that the indictment is fundamentally defective because it fails to properly allege the culpable mental state required to be alleged in a capital murder indictment.

The indictment in question alleges in part:

". . . John Lewis Wilder and Artie Armour, hereinafter referred to as the Defendant, heretofore on or about December 23, 1975, did then and there unlawfully intentionally and knowingly cause the death of Duane Jaixen, by shooting him with a gun, and that the said John Lewis Wilder and Artie Armour were then and there in the course of committing the offense of robbery, . . ."

V.T.C.A., Penal Code, Section 19.03, provides in part:

"(a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:

" * * *

"(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, *robbery*, aggravated rape, or arson." (Emphasis added).

V.T.C.A., Penal Code, Section 19.02, provides in part:

"(a) A person commits an offense if he:

"(1) intentionally or knowingly causes the death of an individual."

Appellant contends that the inclusion of "knowingly" renders the indictment defective. We disagree. The indictment tracks the statutory language and alleges the required culpable mental state. This form of indictment was approved implicitly in *Granviel v. State*, supra, and *White v. State*, 543 S.W.2d 104 (Tex.Cr.App.1976), cert. denied 430 U.S. 988, 97 S.Ct. 1689, 52 L.Ed.2d 384. The indictment did not mislead appellants or fail to give them fair notice of the offense charged.

It is next asserted that the court erred in refusing to instruct the jury on the lesser included offense of murder.

■ It is well established that a charge on a lesser included offense is not required unless there is testimony raising the issue that the accused, if guilty at all, is guilty of a lesser offense included in the greater offense charged. *Dovalina v. State*, 564 S.W.2d 378 (Tex.Cr.App.1978); *Day v. State*, 532 S.W.2d 302 (Tex.Cr.App.1975); *Daywood v. State*, 157 Tex.Cr.R. 266, 248 S.W.2d 479 (1952).

■ Appellants offered no evidence and did not testify. There is no evidence that they did not intend to kill the deceased while in the course of robbing him. There is nothing to show appellants would be guilty of only the lesser included offense of murder.

Next, appellants contend the trial court erred in admitting, at the punishment stage, statements by them in which they acknowledge participating in a similar extraneous offense.

The statements in question were taken after appellants' arrest and no issue of voluntariness is complained of. In the statements, appellants describe a similar robbery-murder of a gas station attendant they committed in Pittsburg about three days before the murder they stood trial for. Each appellant fully admits complicity and gives a detailed account of both murders.

■ At the punishment stage of a capital murder trial, "evidence may be presented as to any matter that the [trial] court deems relevant to sentence." Article 37.-071(a), V.A.C.C.P. See *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976). This has been interpreted as allowing the trial judge wide discretion in the evidence that may be offered. *Livingston v. State*, supra; *Gholson v. State*, supra. Nothing in Article 37.071(a) requires a final conviction for an extraneous offense to be admissible at the punishment stage.

In *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the Supreme Court of the United States discussed the jury questions under Article 37.071, supra, and said:

"What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine."

■ The statements introduced below were relevant to the jury's determination of all three questions under Article 37.071, supra. They shed light on both deliberateness and appellants' future criminal tendencies.

Appellant Armour contends error occurred when Wilder's attorney inferentially commented on Armour's failure to testify.

The record reflects that during closing arguments on guilt and innocence Wilder's attorney stated:

"The law also provides, as the Court charges you . . the Court charges you that the failure of either defendant to testify cannot be taken as a circumstance against them . . now, this is very important . . . please remember that we as attorneys, in dealing with our clients, may have any number of reasons for our clients not testifying, and that's why the law says . . keep it in mind . . the law says you cannot consider that as any evidence against them.

"MR. JAMES DAVIS: Your Honor, I am going to object to his argument on behalf of Artie Armour . . his comment on Artie Armour's election not to testify.

"JUDGE HUTCHINSON: Objection overruled."

Neither appellant testified nor did they offer any other witnesses on their behalf at the guilt stage.

■ It is well established that in determining whether the argument constitutes a comment on defendant's failure to testify, the language used must be examined from the standpoint of the jury; the implication that the language used had reference to the appellant must be a necessary one. It is not sufficient that the language might be construed as an implied or indirect allusion. *Griffin v. State*, 554 S.W.2d 688 (Tex.Cr. App.1977); *Myers v. State*, 527 S.W.2d 307 (Tex.Cr.App.1975); *McDaniel v. State*, 524 S.W.2d 68 (Tex.Cr.App.1975).

In *Givens v. State*, 554 S.W.2d 199 (Tex. Cr.App.1977), we held that a statement by the prosecution which purports to be the law and is not contrary to the court's charge is not prejudicial error.

■ The argument complained of was merely a restatement of the law as set out in the court's charge. It was a correct statement of the law and cannot be interpreted as a harmful reference to Armour's silence. The argument being proper for the State, there is no reason to apply a different rule to counsel for a co-defendant.

The next complaint by Armour is about the following argument:

"Mr. Jim Davis says, where does the State show you that Artie intentionally shot and killed this young man? The State hasn't got to show you that . . the State has got to show you that these two men over here agreed to 'pull a job' as they put it . . and when they pulled their job . . the Judge says the law in Texas is that Artie doesn't even have to anticipate that capital murder is going to be committed."

Specifically, he contends the statement "Artie doesn't even have to anticipate that a capital murder is going to be committed" is a legal opinion directly contrary to the court's charge.

The court's charge to the jury on the law of parties stated that "all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that *should have been anticipated* as a result of

the carrying out of the conspiracy." (Emphasis added).

■ The argument in question is not erroneous nor contradictory to the court's charge. During closing arguments both sides may give a reasonable and proper explanation of the law of the case as contained in the charge. *Dunbar v. State*, 551 S.W.2d 382 (Tex.Cr.App.1977); *Atwood v. State*, 537 S.W.2d 749 (Tex.Cr.App.1976).

■ Under the charge and the law governing this case, appellant Armour did not have to in fact anticipate that capital murder would be committed; he could be found guilty of the offense if he *should have* anticipated the murder. See V.T.C.A., Penal Code, Section 7.02(b). In this light then it is clear that the argument complained of was a correct statement of the law as contained in the charge, and therefore the overruling of appellant's objection was not reversible error. See *Givens v. State*, supra; *Lincoln v. State*, 508 S.W.2d 635 (Tex. Cr.App.1974).

Appellant Armour next complains of the following argument by the State:

"Now, let's see if Artie Armour anticipated this. Let's look at the evidence. Who said, 'are we going to do it?' Remember . . who said that? Artie Armour said that. Who said, 'it was up to Artie' . . John Wilder said, 'it was up to Artie' . . Artie made the decision. Who said, 'stop, there's a guy over there by himself' . . Artie Armour said this . .

"MR. JAMES DAVIS: Your Honor. He is arguing in direct contradiction of the Court's charge, which tells the jury that they're not to consider what John Wilder had to say in his statement against Artie Armour.

"JUDGE HUTCHINSON: Objection overruled."

These statements were contained in Wilder's confession.

■ Despite the fact that the argument was a reasonable deduction from the evidence, the confession of one co-defendant

cannot be used as evidence against the other. Although appellant's objection should have been sustained, the error does not require reversal.

■ The principal point of the challenged argument, that Armour conspired with Wilder to commit the robbery, was one the prosecutor was entitled to make. Furthermore, the physical evidence against Armour was substantial; in his confession he states essentially the same facts the prosecutor alluded to, and the court's charge directed the jury to not consider one appellant's confession as evidence against the other. Under the circumstances and the reasons set out above relating to the *Bruton* issue, the error was harmless. See *Livingston v. State,* 531 S.W.2d 821 (Tex.Cr. App.1976); *Threadgill v. State,* 156 Tex. Cr.R. 157, 239 S.W.2d 813 (1951).

■ In their next ground of error, appellants contend reversal is required because the statements of B. C. Sustaire, Chief of Police of Mount Pleasant, mentioned that appellant Wilder was under investigation for two armed robberies.

At the guilt-innocence phase the witness Sustaire testified that:

"Q. Would you tell the Court and the jury how you obtained that pistol, please, sir?

"A. In my own words?

"Q. Yes, sir.

"A. John Lewis, on the morning of the 14th, was waiting when I got to the office . . he had been placed in jail on a drunk charge . . he didn't have the money to pay out, and he was waiting to see if I could let him out on the credit until he got his check. I had talked to John Lewis prior to this about two armed robberies that I had had there in Mt. Pleasant.

"MR. JAMES DAVIS: I object to that, your honor.

"JUDGE HUTCHINSON: I sustain that objection . . members of the jury, you will not consider that remark for any purpose whatsoever.

"MR. JAMES DAVIS: Nevertheless, your honor, I request a mistrial be declared.

"JUDGE HUTCHINSON: Motion overruled."

In *Schneble v. Florida,* supra, the Supreme Court of the United States stated:

"A defendant is entitled to a fair trial but not a perfect one."

If there was error in the witness' statement, it was not reversible. The witness did not state nor infer that appellant Wilder was suspected of the armed robberies; he merely testified that he had talked to him about them. Moreover, the court's prompt instruction to the jury to disregard was sufficient to remove any error or innuendo arising from the statement. See *Smith v. State,* 540 S.W.2d 693 (Tex.Cr.App. 1976); *Jackson v. State,* 536 S.W.2d 371 (Tex.Cr.App.1976); *Gonzales v. State,* 414 S.W.2d 181 (Tex.Cr.App.1967).

Appellants contend the trial court erred in overruling their objection to the testimony of Ranger Red Arnold on the ground that it was hearsay.

In his testimony, Ranger Arnold stated that he conducted the investigation of the murder weapon and related that the pistol had been sold to appellant Wilder on December 9, 1975. The testimony was offered to prove Wilder's ownership, not where or when he had purchased it.

■ It is well established that the improper admission of evidence does not constitute reversible error if the same facts are proven by other proper evidence. *Lovel v. State,* 538 S.W.2d 630 (Tex.Cr.App.1976); *Lassere v. State,* 458 S.W.2d 81 (Tex.Cr. App.1970).

In *Blansett v. State,* 556 S.W.2d 322 (Tex. Cr.App.1977), an F.B.I. agent was allowed to testify over objection that the defendant's accomplice had told him the weapon recovered was the one used in the murder. This Court held that the admission of this testimony was harmless where other independent evidence proved that the pistol was the murder weapon. See *Huff v. State,* 560 S.W.2d 652 (Tex.Cr.App.1978); *Fazzino v. State,* 531 S.W.2d 818 (Tex.Cr.App.1976).

In this case other competent evidence proved Wilder owned the pistol. In fact, this is admitted in Wilder's confession. Also, Chief Sustaire testified that Wilder led him to Armour's house to recover the weapon. The admission of Ranger Arnold's hearsay statement was in these circumstances harmless beyond a reasonable doubt.

Appellants next contend that the evidence is insufficient to support their convictions because the corpus delicti of the robbery was not proved.

While appellants are correct in stating that proof of the corpus delicti may not be made by an extrajudicial confession standing alone, the proof need not be independent of the confession. If there is some evidence corroborating the confession, the confession may be used to establish the corpus delicti. *Batterbee v. State*, 537 S.W.2d 12 (Tex.Cr.App.1976); *Self v. State*, 513 S.W.2d 832 (Tex.Cr.App.1974); *Fields v. State*, 468 S.W.2d 71 (Tex.Cr.App.1971).

In the instant case, the independent evidence is sufficient to establish the corpus delicti. The confession of each appellant connects him with the crime.

Terry Watlington, Chief Deputy Sheriff of Bowie County, testified that the drawer of the service station cash register was open when he arrived on the scene and that it contained only small change. He stated that a television was also missing from the premises.

Willie Huff, Deputy Sheriff of Bowie County, identified the television seized at Armour's house as the one he had watched previously at the service station and which was discovered missing from there after the incident in question.

This testimony, coupled with the physical evidence seized and the confessions of appellants, establishes the corpus delicti of the robbery. See *Prodan v. State*, 574 S.W.2d 100 (Tex.Cr.App.1978), and *Whitaker v. State*, 160 Tex.Cr.R. 271, 268 S.W.2d 172 (1954). Moreover, as we are bound to view the evidence in a light most favorable to the verdict, we hold the evidence was sufficient to sustain the convictions of both appellants.

Next, appellant alleges that the trial court erred in excluding eight jurors in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

Howard M. Meek stated that he had conscientious scruples against the death penalty and that he could never be a part of taking a person's life regardless of the circumstances. No *Witherspoon* error is shown. See *Granviel v. State*, supra; *White v. State*, 543 S.W.2d 104 (Tex.Cr.App. 1976); *Tezeno v. State*, 484 S.W.2d 374 (Tex.Cr.App.1972).

Freddie Callahan stated that while she was not opposed to the death penalty she did not feel she could render a fair verdict because of what she had read and seen in the newspapers. She was challenged for cause under Article 35.16(a)(9), V.A.C.C.P., not *Witherspoon*, as appellants allege. No error is shown.

Gina Davis was questioned by the trial judge as follows:

"Q. (By Judge Hutchinson) If you knew if you answered both those questions 'yes' that the Court would have to impose the death penalty on the defendant that you had found guilty, either one of them or both of them . . if you knew if you answered them 'yes', could you answer 'yes' if the evidence justified it . . if the State met their burden of proof, and proved to you beyond a reasonable doubt that a 'yes' answer was a proper answer, could you answer each question 'yes', knowing that then the Court would impose the death sentence?

"A. No, I don't think I could.

"Q. I am going to excuse her.

"MR. JAMES DAVIS: Note our exception."

This exchange shows this prospective juror could not assess the death penalty in this case or any other. Additionally, appellant declined to question her regarding her feel-

ings. No error is shown under *Wither-spoon*. See *Granviel v. State*, supra, and *White v. State*, supra.

Levan Threadgill stated that he could not impose the death penalty· "under any conceivable set of circumstances." Laura E. Houff stated that she opposed the death penalty and that "under no set of facts or circumstances" could she vote to impose the death penalty. Leola Burnett, Juanita E. McKinney and Ruth C. Singleton also stated that under no set of circumstances could they vote to impose the death penalty. No error is shown under *Witherspoon*. ·

▆ Finally, appellants challenge the constitutionality of V.T.C.A., Penal Code, Section 19.03, because the caption or title to the 1973 Act, H.B. 200, appearing in Chapter 426, Acts, Regular Session of the 63rd Legislature of 1973, fails to meet the requirement of Article 3, Section 35 of the Texas Constitution because it embraces more than one subject and is, therefore, insufficient to inform the Legislature and the public of the full effect of the amendment.

This contention was addressed and specifically rejected by this Court in *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977); *Brown v. State*, 554 S.W.2d 677 (Tex.Cr. App.1977), and *Smith v. State*, supra, and it is again rejected.

No reversible error is shown. The judgment is affirmed.

DALLY, J., concurs in the result.

CLINTON, J., not participating.

ROBERTS, Judge, dissenting.

I dissent.

I would hold that the pistol used to kill the deceased and the television set which was taken in the course of the robbery-murder were obtained as the result of the unlawful custodial interrogation of Wilder and Armour and that due to this constitutional violation, reversible error was committed when these items were admitted into evidence. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Some of the more salient facts surrounding the recovery of the two aforementioned items which were omitted from the majority's otherwise comprehensive summary of the evidence are as follows: In the course of his investigation of the offense, Texas Ranger R. M. Arnold determined that the weapon which fired the fatal shots was an Arminius .38 caliber pistol. After reviewing gun dealers' sales records in Bowie and surrounding· counties, Arnold comprised a list of "suspects" which included all recent purchasers of this type of firearm. As a result, he learned that Wilder purchased such a pistol from Gibson's Discount Center in Mt. Pleasant approximately two weeks prior to the offense. Arnold then contacted B. C. Sustaire, Mt. Pleasant's Chief of Police, and the two men discussed various methods of obtaining the pistol for ballistics analysis without the necessity of first obtaining a search warrant.

Sustaire testified that when he arrived at his office on the morning of February 14, 1976, approximately seven weeks subsequent to the offense, he found Wilder there waiting to talk to him about the possibility of being released on a public intoxication charge for which he had been jailed the previous night. After arrangements were made for Wilder's release on this charge, Sustaire began questioning him about the pistol without first giving him the benefit of *Miranda* warnings or warnings pursuant to Article 38.22, Vernon's Ann. C.C.P. Wilder admitted owning the pistol and, at Sustaire's request, agreed to surrender it for inspection. Accompanied by another officer, Sustaire drove Wilder in a patrol car to Armour's house where Wilder said he kept the pistol. On cross-examination, Sustaire testified:

"Q [W]hy then did you go with him and get the pistol, rather than letting him just bring the pistol in later on?

"A Well, I felt at the time it was the thing for me to do. I needed the pistol, and I didn't want to take any chances on him changing his mind."

Sustaire and the accompanying officer went with Wilder to Armour's doorstep where

Armour, without first being advised of his *Miranda* rights, gave the pistol to Wilder who then surrendered it to the officers. Sustaire testified that he permitted Wilder to leave when they returned to the police station and that he never considered Wilder to be in his custody.

Ranger Arnold testified on cross-examination that he obtained the pistol from Sustaire and then submitted it for ballistics analysis. He further testified:

\* \* \* \* \* \*

"Q When . . what did Chief Sustaire tell you when he brought you the pistol?

"A There was little discussion about what we were going to do with it . . we already knew what we were going to do with it. I'd been looking for this . . we'd been looking for this particular pistol right here for sometime.

\* \* \* \* \* \*

"Q Did . . is it my understanding then that before he ever obtained the pistol, it was your plan to take this pistol and send it to the Lab for a ballistics test?

"A Take it to the Lab, yes, sir.

\* \* \* \* \* \*

"Q Alright, at that point in time, had you in your investigation of the killings in Hooks, and killing in Bowie County, had you focused your investigation on John Lewis Wilder and Artie Armour?

"A Yes, sir, I had.

"Q That was because of information you had received prior to that date?

"A Yes, sir.

\* \* \* \* \* \*

"Q So at the time you took Wilder's pistol, he was the focus of your investigation and there wasn't any other suspect you knew of?

"A No, sir, didn't have any other suspect at the time."

The results of the ballistics test on Wilder's pistol confirmed the fact that it was the murder weapon; based on the results of that test, arrest warrants were issued for Wilder and Armour. In executing the arrest warrant on Armour, officers recovered from inside Armour's house the television set in question.[1]

In *Ancira v. State*, 516 S.W.2d 924 (Tex. Cr.App.1974), an appeal from a conviction for possession of heroin, we held to be reversible error the trial court's failure to suppress the heroin in question acquired as the result of the custodial interrogation of Ancira when he had not been given the *Miranda* warnings. We stated:

"In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the United States Supreme Court held that evidence obtained as the result of a custodial interrogation was inadmissible unless the State proved that proper warnings were given to the defendant and an affirmative waiver of rights was shown. See Art. 38.22, V.A.C.C.P. Custodial interrogation was defined in *Miranda* as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'

\* \* \* \* \* \*

"While questioning does not have to occur at the police station for *Miranda* warnings to be required, *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), *Miranda* stated, '[C]ompulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation.'

"It is not necessary that an accused be under formal arrest prior to the interrogation for *Miranda* rights to arise. *Windsor v. United States*, 389 F.2d 530 (5th Cir., 1968). In *Windsor*, it was held that *Miranda* rights had arisen, and the

---

1. Contrary to what the majority says, this writer's review of the record reveals that the television set was not recovered as a result of a consent search of Armour's house; rather it was recovered during the execution of the arrest warrant for Armour.

Court said, 'The Government agents' testimony that Windsor was not a suspect and not under arrest when questioned in his motel room is belied by the facts of the case. . . . Windsor was definitely the central figure in their investigation . . . .'

"In *Brown v. State*, supra, [475 S.W.2d 938 (Tex.Cr.App. 1972)] and *Jones v. State*, Tex.Cr.App., 442 S.W.2d 698, where this Court held that *Miranda* rights had not arisen, it was noted that the investigation had not begun to focus on the accused.

". . . In *Miranda* itself the Supreme Court explained that 'in custody' was a short-hand phrase for what Escobedo v. Illinois, 1964, 378 U.S. 478, 490, 84 S.Ct. 1758, 12 L.Ed.2d 977, described as an investigation which has focused on an accused." (Emphasis supplied.)

See also *Newberry v. State*, 552 S.W.2d 457 (Tex.Cr.App.1977).

In the present case, Wilder, while "in the isolated setting of the police station," *Miranda*, supra, in response to interrogation initiated by Sustaire, confessed to his ownership and the location of the pistol; Sustaire found it necessary to accompany Wilder to Armour's house where, in the presence of Sustaire and another officer, Armour surrendered the pistol.[2] The evidence also showed that prior to Sustaire's interrogation of Wilder concerning the pistol he and Arnold had discussed various plans for obtaining Wilder's pistol without the necessity of first obtaining a search warrant; Arnold testified unequivocally that *prior to* the questioning of Wilder the investigation of the offense had focused on Wilder and Armour.

Under these circumstances, I conclude that at the time the pistol was surrendered by Wilder and Armour they were significantly deprived of their freedom of action in such a manner as to place them in the type of constructive custody which fosters involuntary self-incrimination; this was precisely the situation contemplated by *Miranda*. I would hold, therefore, that the fruits of this unlawful police activity should have been suppressed at the appellants' trial.[3] *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The majority holds, that due to the overwhelming untainted evidence of appellants' guilt, i. e. their voluntary confessions, the

---

**2.** We attach no significance to the fact that Wilder may have asked Armour for the pistol rather than the officers because at this time Wilder was assisting the officers in their investigation of the offense, and therefore acting as their agent in this matter.

**3.** I would likewise hold that the television set recovered by the officers when executing the arrest warrant on Armour should have been excluded because the warrant was issued as the direct result of the ballistics analysis confirmation of the illegally obtained pistol as the murder weapon. *Wong Sun*, supra.

The admissibility of appellants' written confessions on the other hand presents a different question.

The record shows that on February 19, 1976, the day that they were arrested, appellants duly received the magistrate's warning prescribed by Art. 15.17, Vernon's Ann. C.C.P. On February 20, 1976, each appellant gave a full written confession describing the manner in which they committed the offense. No complaint is made in this appeal concerning the adequacy of these warnings or the voluntariness of the confessions. Coercion has not been urged or established.

Prior to the trial, the court conducted a hearing to determine the voluntariness of the confessions. See *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). The testimony established that appellants were properly advised of their rights in compliance with Article 38.22, Vernon's Ann. C.C.P. and *Miranda v. Arizona*, supra, and that they waived those rights before they gave the confessions.

Consequently, I conclude that the connection between the unlawful interrogation of Wilder and Armour and their subsequent confessions "had become so attenuated as to dissipate the taint," and therefore rendered the confessions admissible. *Wong Sun*, supra. See also *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). The degree of appellants' free will to make the complained of statements is a relevant factor in determining "the extent to which the basic purpose of the exclusionary rule will be advanced by its application." *United States v. Ceccolini*, 435 U.S. 268, 276, 98 S.Ct. 1054, 1060, 55 L.Ed.2d 268, 277 (1978). Cf. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

error in admitting the items in question cannot be accorded reversible weight. With this conclusion, I cannot agree. In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Court admonished against giving too much emphasis to "overwhelming evidence" of guilt, stating that constitutional errors affecting the substantial rights of the aggrieved party could not be considered to be harmless. See also *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). Also, the Court in *Chapman*, supra, recognized that "harmless-error rules can work very unfair and mischievous results" in some instances, and emphasized that "error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot . . . be conceived of as harmless." Id., 386 U.S. at 22–24, 87 S.Ct. at 827, 17 L.Ed.2d at 710. Finally, the Court in *Chapman*, supra, stated:

> ". . . We prefer the approach of this Court in deciding what was harmless error in . . . *Fahy v. State of Connecticut*, [375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)].[4] There we said: 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' Id., at 86–87, 11 L.Ed.2d at 173."

Thus, the Court in *Chapman* left no doubt that for an error to be harmless it must have made *no* contribution to the defendant's conviction. *Harrington v. California*, (dissenting opinion), supra. See also *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972).

It is a settled principle that an extrajudicial confession standing alone is insufficient to support a verdict of guilt; such a confession must be corroborated by other independent evidence of guilt, either circumstantial or direct. *Wong Sun*, supra, 371 U.S. at 491, 83 S.Ct. at 419, 9 L.Ed.2d at 459. *Martinez v. State*, 387 S.W.2d 673 (Tex.Cr.App. 1965). Moreover, the extrajudicial confes-

sion of a co-defendant may not be used to corroborate a like confession of the defendant. *Wong Sun*, supra, 371 U.S. at 491, 83 S.Ct. at 419, 9 L.Ed.2d at 457. The items in question which were erroneously admitted during the appellants' joint trial tended to provide in part, if not exclusively, the required corroboration of appellants' extrajudicial confessions. Thus, I would hold that the admission of these two items of relevant evidence contributed to appellants' convictions for capital murder, and therefore reversible error was committed. *Chapman v. California*, supra; *Fahy v. Connecticut*, supra.

Nor can I agree with the majority's conclusions with respect to appellants' lack of standing in the present case to challenge the admissibility of the items in question. As previously indicated, the record reflects that Wilder confessed to his ownership and location of the pistol while he was under interrogation at the police station awaiting his release on a charge for public intoxication; Wilder was then placed in a patrol car and taken to Armour's house by Sustaire, who was accompanied by another officer; in the presence of the two officers, Armour confessed to his possession of the pistol and surrendered it to them. It is uncontroverted that the foregoing events occurred at a time when the investigation had clearly focused upon appellants and before each had been apprised of their constitutional privilege against self-incrimination.

The majority seeks to deny appellants' standing on the principle that only victims of a search whose Fourth Amendment rights have been violated have standing to object to the admissibility of the unlawfully seized evidence; they cite *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1961); *Wong Sun v. United States*, supra; *Alderman v. U. S.*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1967), and *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387, 24 Crim.L.Rptr. 3009 (1978), as authority for their holding.

---

4. In *Fahy v. Connecticut*, supra, the admission of illegally seized evidence was held to be reversible despite the overwhelming evidence of

the accused's guilt which included extrajudicial as well as judicial confessions.

With the soundness of this generally accepted principle, I have no quarrel; however, its applicability to the facts of the present case escapes me. At issue in the present case is the admissibility of evidence obtained as the result of the unlawful custodial interrogation of Wilder and Armour, not the admissibility of evidence obtained as the result of an unlawful search and seizure.

In *Wong Sun*, supra, one of the very cases the majority purport to apply, Toy and Wong Sun were tried for federal narcotics laws violations. Toy, who the Court held was unlawfully arrested, gave information leading federal agents to Yee and Wong Sun. In Yee's possession was found an ounce of heroin which was used as evidence against Toy and Wong Sun. As to Toy, it was held that the heroin recovered from Yee should have been excluded as the fruit of the officers' unlawful action. The Court stated: "The exclusion of the narcotics as to Toy was required solely by their tainted relationship to information unlawfully obtained from Toy." Id., 371 U.S. at 492, 83 S.Ct. at 419, 9 L.Ed.2d at 458. However, the heroin seized from Yee was held admissible against Wong Sun because "The seizure of this heroin invaded no right of [his] privacy of person or premises . . ." Id., at 492, 83 S.Ct. at 419, 9 L.Ed.2d at 458.

Under the governing principles of *Wong Sun*, supra, the continuing vitality of which stand unchallenged, I would hold that Wilder and Armour have standing to challenge the admissibility of the pistol and television set because each had his *Miranda* rights violated; the items in question were recovered as a result of their custodial interrogation at a time when the investigation had clearly focused upon them and when neither had been apprised of his constitutional privilege against self-incrimination.

This writer is not insensitive to the enormous, albeit necessary, expenditures of time, money and human resources which accompany most criminal prosecutions; however, no such expenditure can justify a denial of the fundamental rights of an accused accorded him as a citizen of this state and nation; for the rights of an accused come not from judicial generosity but from prescribed rules of law to be applied evenhandedly despite the consequences.

"To follow the dictates of justice when in harmony with the law, must be a pleasure; but to follow the rules of law, in their true spirit, to whatever consequences they may lead, is a duty." *Duncan v. Magette*, 25 Tex. 245 (1860).

To this ideal we have always been committed; the preservation and maintenance of its integrity should be our unswerving objective.

For the reasons stated, I would reverse and remand the judgments of conviction.

I respectfully dissent.

ODOM, J., joins in this dissent.

PHILLIPS, Judge, dissenting.

I concur in the dissent of Judge Roberts except that part which holds that the confessions of John Wilder and Artie Armour are admissible evidence. Such a conclusion should be left to the trial judge after conducting a hearing on whether the taint of the warningless interrogation was sufficiently "attenuated." *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), requires more than the single determination that the confession was voluntary. It also eliminates the provision of warnings as the sine qua non of an admissible confession. If we only today conclude that unconstitutional conduct tainted a part of this police investigation, the trial court should make an initial determination of the extent the tree (the police investigation) was poisoned and whether any antidote intervened before the appellants confessed.

I further dissent on an additional ground raised by appellant Armour. Assuming arguendo that both appellants' confessions were admissible as voluntary and untainted, I dissent from the majority's disposition of appellant Armour's ground of error which contends that the introduction of the confession given by his co-defendant, John Wilder, violated his right to confront and cross-examine the witnesses against him. See

United States Constitution, Amendments VI and XIV; *Bruton v. U. S.*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Unlike the majority, I cannot conclude that the confession of appellant Armour's co-defendant, John Wilder, in this joint trial did not contribute to the jury's rendering a guilty verdict against the appellant Armour.

As an introductory matter, it is noted that the following provisions of the court's charge were of material importance to the jury's deliberation concerning appellant Armour.

### IV.

A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

Each party to an offense may be charged with commission of the offense.

Each party to an offense may be charged and convicted without alleging that he acted as a principal or accomplice.

A person is criminally responsible for an offense committed by the conduct of another if in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

### XI.

You are instructed that the statement of the Defendant, Artie Armour, cannot be used as evidence against the Defendant, John Lewis Wilder, nor can the statement of John Lewis Wilder be used, or considered by you, as evidence against Artie Armour, the Defendant. You are further instructed that the statement of one Defendant does not constitute corroboration of the statement of the other Defendant, nor does the statement of one Defendant constitute the proof of the offense which is necessary to corroborate the statement of either or both of the Defendants.

### XII.

You are instructed that under our law a confession, standing alone, is not sufficient to authorize a conviction for the alleged offense. So, if you find from the evidence beyond a reasonable doubt that the Defendant, John Lewis Wilder, made a confession to the commission of the offense, you cannot convict the Defendant, John Lewis Wilder, unless you find from the evidence beyond a reasonable doubt that there is other evidence before you in this case which, of itself, tends to connect the Defendant, John Lewis Wilder, with the offense committed, if any, separate and apart from his alleged confession, if any, and if you have a reasonable doubt that there is such other corroborative evidence, then you will acquit the Defendant, John Lewis Wilder; and if you find from the evidence beyond a reasonable doubt that the Defendant, Artie Armour, made a confession to the commission of the offense, you cannot convict the Defendant, Artie Armour, unless you find from the evidence beyond a reasonable doubt that there is other evidence before you in this case which, of itself, tends to connect the Defendant, Artie Armour, with the offense committed, if any, separate and apart from his alleged confession, if any, and if you have a reasonable doubt that there is such other corroborative evidence, then you will acquit the Defendant, Artie Armour.

\* \* \* \* \* \*

Now, also bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that on or about the 23rd day of December, 1975, in the County of Bowie, State of Texas, the Defendant, Artie Armour, did then and there conspire with the said John Lewis Wilder to commit the offense of robbery, as defined herein, and the said John Lewis Wilder, in furtherance of

such conspiracy, if any, did then and there intentionally or knowingly cause the death of an individual, to-wit: Duane Jaixen, by shooting him with a gun in the course of the commission of the said offense of robbery, and you further find from the evidence beyond a reasonable doubt that such conduct on the part of the said John Lewis Wilder should have been anticipated by the said Artie Armour as a result of the carrying out of the conspiracy, if any, then you will find the Defendant, Artie Armour, guilty of the offense of capital murder, and so say by your verdict, but if you do not so believe, or if you have a reasonable doubt thereof, you will acquit the Defendant and say by your verdict, "not guilty".

The confession of Artie Armour, introduced in this joint trial, omitting the formal parts, reads as follows:

I understand what Judge Ben Grigson has told me. I understand the warning and I still want to talk to you and tell you the truth. I don't really remember the date we came up here, December 22nd or 23rd. By we, I mean John Wilder, Robert Lovelace and myself. We were on our way back home to Mt. Pleasant. We had come from Mt. Pleasant to Texarkana. John rode by his girlfriend's house. I don't know her name, I think it is Harris or something. She is kind of skinny. We stayed over at her house for a little while and then rode around. We were in John's mother's car, a black Torino, Ford. '68 or '69, I think was the year. We rode around and went back home. We went back to Mt. Pleasant on Interstate 30. John pulled over to the service station, he was driving. John said he was going to get gas. We drove past the station that had diesel trucks parked in it, we turned around in the truck stop parking lot then we drove over to the next service station right across the street. I don't know what kind of service station. We drove across the street from the truck stop. I don't remember what the name of the truck stop was. We stayed in the street, not the service station lot. We didn't stop at the first service station.

John drove on past the second service station. I don't know exactly how many yards. You could see the service station from there. He drove past the station and stopped. John told me to get behind the wheel and he got out of the car walked into the station because it was on up a little bit further. He said he was going to hit it . . that meant to me that he was going to rob it. After John got out I moved the car farther from the station. John stayed a minute maybe two minutes. He came back out with a TV in his hand and money in his picket. He took the money out of his pocket and showed it to me. He didn't let Robert see it, though. He had his gun inside his coat. He held the gun up against my nose and told me to smell it and I did and it smelled like it had been fired, the gun barrel had been fired. We were talking real low and John said he had to shoot him. He said he was acting allright at first but he was going to try to run and John said he had to shoot him. He said he had to shoot him two times. He threw the hulls out the window on Interstate. A pretty good piece up the road. He threw the hulls out of his gun through the passenger side of the car. When John got in with the TV he told Robert he had got him a TV and Robert asked him if he ripped the man off and John said no he had bought it from him for $.45 and Robert said that he thought that he had ripped the man off. I knew he had the gun with him all the time. We kept on going home and I started thinking about it and kind of figured he was lying about shooting him. We got off the Interstate on a Farm to Market Road to Naples and came on home. All 3 of us went to my house. We got out and went inside and drank some beer. John got up and went out to the car and got the TV and gave it to me and told me "here, Merle, he calls me Merle, you can have the TV you have been needing one." We split up the money 70 something dollars. I was supposed to get half of the money. Robert didn't get nothing. I think Rob-

ert suspected something because he asked me if John stole that TV and I said probably knowing him. That was the same TV that they found at my house, the same one that John got at the service station and the same TV that the officers took from my house on February 19, 1976. John had a .38 pistol. I didn't have the other pistol with me, it was at my house. We parked on the street by the service station already going to to the Interstate. I forgot what time of night it was. We had gone riding around in Texarkana on Lake Drive we went by Brenda's house, a (Used to be) girlfriend of mine, and her mother said she was asleep. Me, John and Robert went there and then we went riding around in Arkansas. No cops stopped us that night. I know kind of where John's girlfriend lives where we were earlier. Same area as my uncle lives. I think I could take the officers there. I don't remember the time of night we was at the service station. We hadn't talked about doing it before we got to Hooks. We knew we was going to divide the money in half. Before John went to the service station he just said he was going to pull in and get some gas. We turned around then we saw that the boy was in the station by himself. The boy was white and kind of chubby looking to me. We didn't pull through the service station parking lot. We stayed on the street. There were no other cars at the station. I didn't hear any shots. We didn't meet an ambulance coming back on Interstate. I went to High School, 11½ years. I can read and write. The Social Security Card I have is No. 464 17 0292. I am 21 years of age and my date of birth is October 10, 1954. I never got out of the car at the service station. All I did was drive. I never saw John pull his gun. I never saw him take it out. He was carrying his gun inside his pants kind of in front and had his coat around it, with the barrel down in his pants. John told me he had to shoot him twice, once in the chest and once in the stomach. I couldn't see from where we were parked inside the service station. John said he had to

shoot him twice because he was trying to run, he said he acted allright at first but then he tried to run away, tried to get out and John had to shoot him. John told me "I had to kill him because he was trying to run from me." I got 70 something dollars and when John got in the car he told me that he robbed that service station and had this TV in his hand. When he got in the car he acted normal, cool. We had been drinking. We bought the stuff to drink in Monticello. John shot him after he got the money. I don't know why he had to shoot him in the chest and the stomach because he was trying to run. That is what John said. I had never seen this man in the service station before. John said that he didn't know him one day when we was sitting at the house and I said I was sort of worried about it and John said that "it didn't bother him much, because that guy in Texarkana I didn't know him." I have never pulled a job in Texarkana. John never has pulled a job in Texarkana, not with me anyway. He took the shells out of his gun it holds six.

This confession does not clearly establish that the robbery of the station attendant at Hooks was the result of a conspiracy. He states expressly that the matter had not been talked about before getting to Hooks and that it appeared to be a spontaneous matter since his co-defendant stated he was going to "hit it" as they were driving along looking for gas.

On the other hand, the confession of the co-defendant, John Wilder, omitting the formal parts, reads as follows:

We, Robert Lovelace, Artie Burl Armour and myself we came to Texarkana about three days before Christmas. We was going to see Artie's girl by the name of Brenda Cartwright but she wasn't at the same place Artie thought she was so we went to my girlfriends and my ex-girlfriends, Emma James. We talked there for at least 20 or 30 minutes. Robert Lovelace he didn't know anything about anything. He was just in the car with us. Anyway we was drinking gin

and some beers and I think Robert got high or drunk because he was leaning over. We decided to go back to see Carolyn Harris, my girlfriend but she was home but asleep so we left her house about 11:30 or 12:00. We got on Interstate 30 instead of taking the old highway home. *Artie said "Well are we going to do it"*. I said we couldn't with Robert in the car. *Artie said "Oh he is asleep anyway. So I said it was up to Artie* and about that time my car started running hot and I needed to get some water. We went to this truck stop and turned there it was beside Interstate 30. We turned there and went up the lot to get back on the Interstate. *Artie said "Stop there is a guy over there and he is by himself" so we stopped.* I looked over there and there wasn't nobody in there but him. I couldn't tell you how old he was or what he looked like. He was white. So after we went over there *Artie offered me his little gun. It was a .22 but it looked like a .32.* I took my gun, *I didn't want Artie's* he had borrowed it from some guy and I didn't want to get that guy in trouble. So I went in the service station and my gun was in my belt. I had my shirt over my gun. I walked in there and asked him where was the bathroom and he said the bathroom was outside and then I pulled my gun and he made a quick move, he flinched, and I shot him once. I was just intending to rob him. I walked in intending to rob him. He looked like he was fixing to make a move and I shot him. I was about 3 steps away from him when I shot him. I shot him in the front. I didn't have any money at that time. He grabbed his side and stumbled into the backroom. Then I started punching the keys on the cash register trying to get it to open, I pulled the lever on the side and it didn't open. I went to the guy and I said open this thing. He wasn't dead. He was holding his side. He opened the cash register and I got the money out I put the money in my pocket, my pants pocket. I could see a spot of blood on his shirt after the first shot. Got the money

out and put in my pocket then I reached up and snatched the TV and kept going. I shot him going out the door. He was crawling up under the desk on his right side. I shot back at him twice—"Pow, pow." I was bout 6 feet away from him, I was in the doorway. I shot him twice— "Pow, pow." He was already down when I shot him the last two times. He was on his back in the floor after I shot him. When he was laying down on his right side before I shot him the last two times, he was still holding his side with his hand and I turned back around and shot him two more times. He was reached up under the desk with his other hand. I don't think the first shot hit him but the second shot hit him. I just have that feeling that you get in your head that the second shot hit him. He didn't moan, he didn't groan. It was just that feeling that you have in your head that you hit somebody. I hit him in the chest with the second shot. I was too busy running to see if he made any movement. I am left-handed. I was shooting with my left hand and carrying the TV with my right hand. The second shot hit him and I turned and ran. I run to the car to my mother's car and Artie was at the steering wheel. Artie said "Where did you get the TV from?" "The guy was nice enough to give me a TV." I put the TV in the car and got in. *In other words Artie was driving the getaway car.* Robert didn't know anything about it. I don't think he did because he never acted like it. I never have liked him anyway. He ain't done nothing. *We were in the car and Artie said "Did you get it?"* and I said I had got the TV and a little money. I didn't say nothing about no killing then. I didn't think I had killed him. But I had that feeling that I did hit him. After we got to Mt. Pleasant we went to Artie's house. Artie drove. We took Robert home and put Robert out. Robert had to be kind of high because he got out and he staggered. We went to Artie's house. After I got in the car *I took the money out of my pocket and handed it to Artie and he put in his coat*

*and said "Yeah we done went to work again tonight"* and I said "Yeah and I get the blame for it." *Artie said "Yeah we keep on selling dope like this" trying to cover up so Robert wouldn't know. I* wasn't drunk because I don't get drunk. I told Artie that night that I didn't know if I had killed him or not and that I wanted to listen to the radio to see if I had. So I went to Artie's the next day and I heard on the radio the guy was dead." I said to Artie "Well, he died" and *Artie said "It couldn't be helped." We got about $100.00 because he got $50.00 and I got $50.00.* Robert didn't get nothing. We halved the money all the way. *Me and Artie planned the job together and pulled the job together* and if I should go to jail then he would go with me. (Emphasis added.)

As is readily apparent, the confession of John Wilder is much more probative on the question of the existence of a conspiracy prior to the robbery of the station attendant and whether it was known that a deadly weapon would be used in the commission of the robbery, knowledge which would have permitted the jury to reach the inference that a murder "should have been anticipated as a result of the carrying out of the conspiracy." It is the co-defendant's confession that has appellant Armour asking prior to the robbery, "Are we going to do it?," being left with the decision whether to "do it," sighting the lone station attendant to be robbed, handing the triggerman a weapon which was turned down, confirming the success of the robbery, exclaiming that "we done went to work again tonight," and consoling Wilder about having killed the attendant.

As stated in the majority opinion, it is our obligation to review the entire record and make a determination of "the probable impact on the minds of an average jury" the co-defendant's confession would have. See *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). In the State's opening portion of its closing argument to the jury and after reading that portion of the court's charge that applied the law to the facts of the case of appellant Armour, the following appears:

Now, let's see if Artie Armour anticipated this. Let's look at the evidence. Who said, "are we going to do it?" Remember . . who said that? Artie Armour said that. Who said, "It was up to Artie" . . John Wilder said, "it was up to Artie" . . Artie made the decision. Who said, "stop, there's a guy over there by himself" . . Artie Armour said this . . [At this point Armour's trial counsel objects on the basis that the argument is a contradiction to the court's charge which tells the jury not to consider what John Wilder said in his statement. The objection was overruled.]

Ladies and Gentlemen, consider who, after this was over, took a split of the money . . consider who was in possession of that television . . consider who said, when they learned . . after he had been killed . . after Duane Jaixen . . they learned that he had died . . who said, "it couldn't be helped?" Who did all of those acts. Artie Armour did those acts, Ladies and Gentlemen. He drove the car . . he knew what was going on . . also, who said, "are we going to work again tonight?" [Again objection was interposed on the basis of the court's instruction that Wilder's statement was not to be considered by the jury against Armour. The objection was overruled.]

Ladies and Gentlemen, consider all of this evidence . . . consider all of this evidence. Artie Armour knew what was going on . . Artie Armour drove the car . . Artie Armour knew, in his own mind, that if John Wilder went in that station with that gun, that he was going to use it. Consider the fact that two people are walking around here with guns . . don't they anticipate some violence . . don't they anticipate using it . . why, certainly do . . if I pick up my gun, and I stick it in my belt, and I go down here in Texarkana on Saturday night, I anticipate using it, if

necessary . . if necessary, I'm going to use it. Consider those facts.

In the closing portion of the State's closing argument, the following appears with respect to appellant Armour:

Artie said he knew they were going to rob it . . he was going to "hit" it . . he knew he was going to get half the take . . he knew he was to drive the car . . and Jim Davis [appellant Armour's trial counsel] says . . and this is repulsive to me . . I'm here on behalf of a twenty-two (22) year old man . . . .

Now, let's see what Wilder's statement really says . . contrary to what Jim Davis [appellant Armour's trial counsel] says . . Mr. Wilder's statement says, "well, we planned it together . . we did it together . . we split the take . . Artie got the television . . Artie was to drive the get away car, and if I go to jail, Artie ought to go too".

He didn't try to put the blame all on Artie . . he tried to say, "look, we did it together" . . and they did. You don't go out here and pull a "job" . . as they call it . . or you don't "go to work again tonight" as they call it, and split the take and not be conspiring to commit it together. . . . .

Artie couldn't anticipate . . you know . . does this ring true? That Artie couldn't anticipate, when Artie said, "well, it just couldn't be helped". Does it ring true, when Artie said, "well, we're working again tonight" . . does it ring true that he couldn't anticipate when they split the money . . and does it ring true that Artie Armour couldn't anticipate when he took the television and set it up in his house, so he could watch his favorite TV shows, on the television that they got by reason of killing one of our citizens. It doesn't ring of truth . . it stinks.

It is clear from the above referenced portions of the prosecutor's closing argument that considerable reliance was placed on John Wilder's statement to tie appellant Armour into the crime as a co-conspirator who should have anticipated the death of the station attendant to be robbed.

The only other evidence before the jury concerning appellant Armour's involvement in this offense was his confession which has already been referred to, the testimony of police officers that John Wilder took them to appellant Armour's home in order to recover Wilder's .38 caliber pistol which was later matched with the bullets retrieved from the victim's body, and appellant Armour's possession of the TV set stolen in the course of the robbery of the station attendant killed.[1]

On the basis of the evidence in this record, I cannot conclude beyond a reasonable doubt that the confession of John Wilder did not significantly contribute to the conviction of Artie Armour for the offense of capital murder. I therefore respectfully dissent. Appellant Armour's judgment of conviction should be reversed because the introduction of his co-defendant's confession in this joint trial deprived him of his Sixth Amendment right to confront and cross-examine the witnesses against him, as secured to him under the Fourteenth Amendment to the United States Constitution.[2]

1. See Judge Roberts' dissent, supra, which would hold the pistol and TV set inadmissible.

2. Appellant Armour also filed a motion for severance alleging that a joint trial would deny appellant Armour those rights secured to him under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution to confront and cross-examine the witnesses against him. This motion was denied by the trial judge.